**ORAL ARGUMENT NOT YET SCHEDULED**

No. 15-1489

IN THE

# United States Court of Appeals
# for the District of Columbia Circuit

———————————

SIERRA CLUB,

Petitioner,

v.

UNITED STATES DEPARTMENT OF ENERGY,

Respondent.

———————————

On Petition for Review of Orders
of the U.S. Department of Energy

———————————

**BRIEF FOR RESPONDENT-INTERVENORS**
**FREEPORT LNG EXPANSION, L.P., FLNG LIQUEFACTION, LLC,**
**FLNG LIQUEFACTION 2, LLC, AND FLNG LIQUEFACTION 3, LLC**

———————————

LISA M. TONERY
NORTON ROSE FULBRIGHT US LLP
666 Fifth Avenue
New York, N.Y. 10103
(212) 318-3278

JONATHAN S. FRANKLIN
NORTON ROSE FULBRIGHT US LLP
799 9th Street, N.W.
Washington, D.C. 20001
(202) 662-0466

Counsel for Freeport LNG Expansion,
L.P., FLNG Liquefaction, LLC, FLNG
Liquefaction 2, LLC, and FLNG
Liquefaction 3, LLC

June 7, 2016

## CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### A.    PARTIES

All parties, intervenors, and amici appearing in this Court are listed in the Brief for the Respondent Department of Energy.

### B.    RULINGS UNDER REVIEW

References to the rulings at issue appear in the Brief for Respondent Department of Energy.

### C.    RELATED CASES

This case has not previously been before this Court or any other court.  Four related cases, within the meaning of D.C. Cir. R. 28(a)(1)(C), are currently pending in this Court.  *Sierra Club v. Federal Energy Regulatory Commission*, No. 14-1249, and *Sierra Club & Galveston Baykeeper v. Federal Energy Regulatory Commission*, No. 14-1275 were both argued before the same panel of this Court on November 13, 2015 and are currently awaiting decision.  *EarthReports, Inc. (d/b/a Patuxent Riverkeeper), et al. v. Federal Energy Regulatory Commission*, No. 15-1127, was argued on April 19, 2016 and is currently awaiting decision.  *Sierra Club v. Federal Energy Regulatory Commission*, No. 15-1133 was filed on May 11, 2015, and has not yet been scheduled for oral argument.

Respectfully submitted,

/s/ Jonathan S. Franklin

Lisa M. Tonery                         Jonathan S. Franklin
NORTON ROSE FULBRIGHT US LLP    NORTON ROSE FULBRIGHT US LLP
666 Fifth Ave.                         799 9th St., N.W.
New York, N.Y. 10103                   Washington, D.C. 20001
(212) 318-3278                         (202) 662-0466
                                       jonathan.franklin@nortonrosefulbright.com


                                       Counsel for Freeport LNG Expansion, L.P.,
                                       FLNG Liquefaction, LLC, FLNG
                                       Liquefaction 2, LLC, and FLNG
June 7, 2016                           Liquefaction 3, LLC

## CORPORATE DISCLOSURE STATEMENT

Freeport LNG Expansion, L.P., FLNG Liquefaction, LLC, FLNG Liquefaction 2, LLC, and FLNG Liquefaction 3, LLC all have primary places of business in Houston, Texas, and are engaged in the business of constructing, owning, and operating a liquefied natural gas terminal and related facilities in Brazoria County, Texas.

Freeport LNG Expansion, L.P. is a wholly-owned subsidiary of Freeport LNG Development, L.P. Freeport LNG Development, L.P. is a Delaware limited partnership with one general partner, Freeport LNG-GP, LLC, which is in turn owned 99% by MS-GP Holdco, LLC (an entity wholly owned by an individual, Michael S. Smith), and 1% by IFM Investors Midstream, LLC. Freeport LNG Development, L.P.'s limited partners are as follows: (i) Freeport LNG Investments, LLLP and FLNGI Option Holdco, LLC, both entities owned by Michael S. Smith and his family trusts; (ii) GIP II FLNG, L.P. and GIP II FLNG Holdings Partnership 2, L.P., both of which are ultimately wholly owned by Global Infrastructure Partners II Funds; and (iii) Turbo LNG LLC, a wholly-owned subsidiary of Osaka Gas Co., Ltd. (TYO: 9532), a publicly-traded corporation.

FLNG Liquefaction, LLC is a Delaware limited liability company that is indirectly owned by Freeport LNG Expansion, L.P.; Osaka Gas Co., Ltd.; and Chubu Electric Power Co., Inc. (TYO: 9502), a publicly-traded corporation.

FLNG Liquefaction 2, LLC is a Delaware limited liability company that is indirectly owned by Freeport LNG Expansion, L.P. and IFM Global Infrastructure Fund.

FLNG Liquefaction 3, LLC is a Delaware limited liability company that is wholly owned by Freeport LNG Expansion, L.P.

No publicly-held corporation has a 10% or greater ownership interest in Osaka Gas Co., Ltd. or Chubu Electric Power Co., Inc.

Respectfully submitted,

/s/ Jonathan S. Franklin

Lisa M. Tonery
NORTON ROSE FULBRIGHT US LLP
666 Fifth Ave.
New York, N.Y. 10103
(212) 318-3278

Jonathan S. Franklin
NORTON ROSE FULBRIGHT US LLP
799 9th St., N.W.
Washington, D.C. 20001
(202) 662-0466
jonathan.franklin@nortonrosefulbright.com

Counsel for Freeport LNG Expansion, L.P., FLNG Liquefaction, LLC, FLNG Liquefaction 2, LLC, and FLNG Liquefaction 3, LLC

June 7, 2016

iv

# TABLE OF CONTENTS

JURISDICTIONAL STATEMENT ...........................................................1

STATEMENT OF THE ISSUES..............................................................1

STATUTES AND REGULATIONS ..........................................................2

STATEMENT OF THE CASE .................................................................2

      A.   STATUTORY AND REGULATORY BACKGROUND ................2

           1.   Authority Over LNG Exports ................................................2

           2.   Environmental Review Under NEPA ....................................3

           3.   DOE's Public Interest Determination ...................................4

      B.   FACTUAL BACKGROUND ...................................................5

           1.   FERC Proceedings ...............................................................5

           2.   DOE Proceedings .................................................................7

                a.   Procedural History .................................................7

                b.   LNG Export Studies ...............................................10

SUMMARY OF ARGUMENT ..............................................................12

STANDARD OF REVIEW ...................................................................14

ARGUMENT .......................................................................................14

    I.   DOE'S NEPA ANALYSIS WAS NOT ARBITRARY OR
          CAPRICIOUS.............................................................................14

      A.   DOE Properly Found That The Environmental Impacts
           Alleged By Sierra Club Are Not Reasonably Foreseeable .............16

           1.   The Location, Quantity, And Impacts Of Export-
               Induced Gas Production And Coal Use Are Not
                Reasonably Foreseeable....................................................17

           2.   DOE's Consideration Of Local Impacts Was
               Reasonable .......................................................................26

                a.   DOE's Consideration Of Ozone And Water
                     Impacts Was Reasonable .......................................26

                b.   DOE's Consideration of Greenhouse Gas
                     Emissions Was Reasonable ...................................29

v

     B.   DOE's Cumulative Impacts Analysis Was Reasonable ...................33

II.   DOE'S PUBLIC INTEREST ANALYSIS WAS NOT ARBITRARY
    OR CAPRICIOUS .........................................................................36

CONCLUSION ..................................................................................39

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

ADDENDUM OF STATUTES AND REGULATIONS

## TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410 (2011) ....................................30

*Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124 (9th Cir. 2011)............................25

*Black Oak Energy, LLC v. FERC*, 725 F.3d 230 (D.C. Cir. 2013) .........................39

*Blue Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208
    (9th Cir. 1998)...................................................................................................36

*\*Border Power Plant Working Grp. v. DOE*, 260 F. Supp. 2d 997
    (S.D. Cal. 2003) ..........................................................................................18, 22

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy
    Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971) ..........................................................20

*\*City of Dallas, Tex. v. Hall*, 562 F.3d 712 (5th Cir. 2009) ........................15, 16, 22

*City of Davis v. Coleman*, 521 F.2d 661 (9th Cir. 1975)........................................25

*\*City of Shoreacres v. Waterworth*, 420 F.3d 440 (5th Cir. 2005) .............15, 22, 34

*Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215 (5th Cir. 2006).................22

*Del. Riverkeeper Network v. FERC*, 753 F.3d 1304 (D.C. Cir. 2014) ..............15, 34

*\*Dep't of Transp. v. Public Citizen*, 541 U.S. 752 (2004) ................................15, 16

*Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp.
    2d 30 (D.D.C. 2000) ...........................................................................................25

*Grunewald v. Jarvis*, 776 F.3d 893 (D.C. Cir. 2015) ...............................................3

*Habitat Educ. Ctr. v. U.S. Forest Serv.*, 609 F.3d 897 (7th Cir. 2010) .................24

*High Country Conservation Advocates v. United States Forest
    Service*, 52 F. Supp. 3d 1174 (D. Colo. 2014)............................................25, 26

 * Authorities upon which we chiefly rely are marked with asterisks.

*Intermountain Mun. Gas Agency v. FERC*, 326 F.3d 1281 (D.C. Cir. 2003) ..........................................................................................31

*Kleppe v. Sierra Club*, 427 U.S. 390 (1976) ............................................36

*Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766 (1983) ............................................................................................16

*Mid States Coalition for Progress v. Surface Transportation Board.*, 345 F.3d 520 (8th Cir. 2003) .............................................................24

*Motor Vehicles Manufacturers Ass'n of the U.S. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29 (1983) ..................................38

*Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827 (D.C. Cir. 1972)..................15

*Oneok, Inc. v. Learjet, Inc.*, 135 S. Ct. 1591 (2015).................................19

*Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 822 F.2d 1105 (D.C. Cir. 1987) .......................................5, 37

*Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989)...............15, 22

*Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079 (D.C. Cir. 1973).................................................................15

*Sierra Club v. Marsh*, 769 F.2d 868 (1st Cir. 1985).................................25

*Sierra Club v. Marsh*, 976 F.2d 763 (1st Cir. 1992).............................15, 27

*\*Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497 (D.C. Cir. 2010) ...............................................................................35

*Town of Cave Creek, Ariz. v. F.A.A.*, 325 F.3d 320 (D.C. Cir. 2003) ..............34, 35

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519 (1978)...................................................................................3

*W. Va. Pub. Servs. Comm'n v. DOE*, 681 F.2d 847 (D.C. Cir. 1982)................5, 37

*Wash. Gas Light Co. v. FERC*, 532 F.3d 928 (D.C. Cir. 2008) .............................36

*Webster v. U.S. Dep't of Agric.*, 685 F.3d 411 (4th Cir. 2012) .......................22

*Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209 (10th Cir. 2011) ................22, 34

**Statutes:**

15 U.S.C. § 717(b) ................................................................................19

15 U.S.C. § 717b ...................................................................2, 4, 5, 37

15 U.S.C. § 717n(b)(1) ..........................................................................4

15 U.S.C. § 717r(b) ................................................................1, 30, 31

42 U.S.C. § 4332(C)(i) ..........................................................................3

42 U.S.C. § 7151(b) ...............................................................................2

42 U.S.C. § 7172(f) ...............................................................................2

**Administrative Materials:**

40 C.F.R. § 1501.5(a) ............................................................................4

40 C.F.R. § 1501.6 ................................................................................4

40 C.F.R. § 1502.4(b) ..........................................................................35

40 C.F.R. § 1502.16 ..........................................................................3, 14

40 C.F.R. § 1502.22(b) ........................................................................21

40 C.F.R. § 1503.2 ................................................................................4

40 C.F.R. § 1503.3 ................................................................................4

40 C.F.R. § 1506.3 ................................................................................4

*40 C.F.R. § 1508.7 ..........................................................................4, 34

*40 C.F.R. § 1508.8 ......................................................................3, 14, 34

40 C.F.R. § 1508.25(c) ..........................................................................4

43 Fed. Reg. 47,769 (Oct. 17, 1978) ....................................................3

49 Fed. Reg. 6684 (Feb. 22, 1984) .......................................................2

77 Fed. Reg. 73,627 (Dec. 11, 2012) ...............................................................10, 11

79 Fed. Reg. 32,258 (June 4, 2014) ........................................................................12

79 Fed. Reg. 32,260 (June 4, 2014) ........................................................................12

79 Fed. Reg. 48,132 (Aug. 15, 2014) ...............................................................11, 12

79 Fed. Reg. 69,101 (Nov. 20, 2014) ......................................................................8

80 Fed. Reg. 64,510 (Oct. 23, 2015).......................................................................20

80 Fed. Reg. 64,662 (Oct. 23, 2015).......................................................................20

DOE, Delegation Order No. 00-004.00A (May 16, 2006) .........................................3

DOE, Re-Delegation Order No. 00-006.02 (Nov. 17, 2014)......................................2

*Freeport LNG Development, L.P., et al.*, 148 FERC ¶ 61,076 (2014) .....................6

*Freeport LNG Development, L.P., et al.*, 149 FERC ¶ 61,119 (2014) .....................6

*Freeport LNG Expansion, L.P. & FLNG Liquefaction, LLC*, DOE/FE
   Order No. 2913 (2011)......................................................................................7

*Freeport LNG Expansion, L.P. & FLNG Liquefaction, LLC*, DOE/FE
   Order No. 3066 (2012)......................................................................................7

*\*Freeport LNG Expansion, L.P., et al.*, DOE/FE Order 3357-C
   (2015) ........................................... 9, 17, 18, 19, 20, 21, 22, 26, 27, 28, 29, 31, 37

*Freeport LNG Expansion, L.P., et al.*, DOE/FE Order No. 3282-C
   (2014) ...............................................................................................................7

*Freeport LNG Expansion, L.P., et al.*, DOE/FE Order No. 3357
   (2013) ..........................................................................................................8, 37

*\*Freeport LNG Expansion, L.P., et al.*, DOE/FE Order No. 3357-B
   (2014) ........................................ 8, 9, 17, 18, 21, 26, 27, 29, 31, 32, 33, 35, 37, 38

**Other Materials:**

Susan Kemball-Cook, *et al.*, *Ozone Impacts of Natural Gas
    Development in the Haynesville Shale*, 44 Envtl. Sci. & Tech. 9357
    (2010) ...................................................................................................28

Bureau of Land Management, *Continental Divide-Creston Natural
    Gas Development Project*, *Draft EIS* (Nov. 2012)..............................................29

# GLOSSARY

2012 EIA Study ................................. U.S. Energy Information Administration, *Effect of Increased Natural Gas Exports on Domestic Energy Markets* (2012)

2012 NERA Study ............................. NERA Economic Consulting, *Macroeconomic Impacts of LNG Exports from the United States* (2012)

Addendum ......................................... U.S. Dep't of Energy, *Addendum to Environmental Review Documents Concerning Exports of Natural Gas from the United States* (Aug. 15, 2014)

Conditional Order .............................. *Freeport LNG Development, L.P., et al.*, FE Docket No. 11-161-LNG, DOE/FE Order No. 3357 (2013)

DOE................................................... U.S. Department of Energy

EIS .................................................... Environmental Impact Statement

EIA .................................................... Energy Information Administration

EPA ................................................... U.S. Environmental Protection Agency

Authorization Order ........................... *Freeport LNG Expansion, L.P., et al.*, FE Docket No. 11-161-LNG, DOE/FE Order No. 3357-B (2014)

FERC................................................. Federal Energy Regulatory Commission

FONSI ............................................... Finding of No Significant Impact

Freeport ............................................. Respondent-Intervenors Freeport LNG Expansion, L.P., FLNG Liquefaction, LLC, FLNG Liquefaction 2, LLC, and FLNG Liquefaction 3, LLC

JA ...................................................... Joint Appendix

Life Cycle Perspective ........................ DOE, *Life Cycle Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United States* (2014)

Liquefaction Project ........................... Freeport LNG Liquefaction Project, FERC Docket No. CP12-509-000

LNG .................................................... liquefied natural gas

NEPA ................................................. National Environmental Policy Act

NGA ................................................... Natural Gas Act

Rehearing Order ................................. *Freeport LNG Development, L.P., et al.*, FE Docket No. 11-161-LNG, DOE/FE Order No. 3357-C (2015)

Sierra Club ......................................... Petitioner Sierra Club

IN THE
# United States Court of Appeals
# for the District of Columbia Circuit

———————————

No. 15-1489

———————————

SIERRA CLUB,

Petitioners,

v.

UNITED STATES DEPARTMENT OF ENERGY,

Respondent.

———————————

Petition for Review of Orders
of the United States Department of Energy

———————————

**BRIEF FOR RESPONDENT-INTERVENORS
FREEPORT LNG EXPANSION, L.P., FLNG LIQUEFACTION, LLC,
FLNG LIQUEFACTION 2, LLC, AND FLNG LIQUEFACTION 3, LLC**

———————————

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 15 U.S.C. § 717r(b).

## STATEMENT OF THE ISSUES

1.     Was it arbitrary and capricious for the Department of Energy ("DOE")

to determine that the National Environmental Policy Act ("NEPA") did not require

analysis of alleged environmental impacts from increased domestic natural gas

production and coal consumption that could be induced by the exports under

1

review because such impacts are not reasonably foreseeable, whether considered alone or in connection with other issued and pending authorizations?

2.     Was it arbitrary and capricious for DOE to conclude that Sierra Club did not meet its burden under Section 3 of the Natural Gas Act ("NGA") to rebut the presumption that the exports under review are consistent with the public interest?

## STATUTES AND REGULATIONS

Except for those in the addendum, applicable statutes and regulations are contained in DOE's brief.

## STATEMENT OF THE CASE

**A.     STATUTORY AND REGULATORY BACKGROUND.**

**1.  Authority Over LNG Exports.**

NGA § 3 prohibits exports of U.S. natural gas without an authorizing order. Pub. L. No. 75-688, § 3(a), 52 Stat. 821, 822 (1938) (codified as amended at 15 U.S.C. § 717b(a)).  This authorization authority, initially vested in the Federal Power Commission, was transferred to DOE.  Pub. L. No. 95-91, §§ 301(b), 402(f), 91 Stat. 565, 578, 585 (1977) (codified at 42 U.S.C. §§ 7151(b), 7172(f)).

DOE has retained its § 3 authority over export authorizations.  *See* 49 Fed. Reg. 6684, 6688 (Feb. 22, 1984); DOE, Re-Delegation Order No. 00-006.02, § 1.3.A (Nov. 17, 2014).  But since 1978, DOE has delegated to the Federal Energy Regulatory Commission ("FERC") the separate authority over "the

2

construction and operation of particular facilities, the site at which such facilities

shall be located, and with respect to natural gas that involves the construction of

new domestic facilities, the place of entry for imports or exit for exports[.]"  DOE,

Delegation Order No. 00-004.00A, § 1.21.A (May 16, 2006); *see also* 43 Fed. Reg.

47,769, 47,772 (Oct. 17, 1978).

### 2.  Environmental Review Under NEPA.

NEPA requires a federal agency to prepare an environmental impact

statement ("EIS") before undertaking a "major Federal action[] significantly

affecting the quality of the human environment."  42 U.S.C. § 4332(C)(i).

"NEPA's mandate 'is essentially procedural.'"  *Grunewald v. Jarvis*, 776 F.3d 893,

903 (D.C. Cir. 2015) (quoting *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def.*

*Council, Inc.*, 435 U.S. 519, 558 (1978)).  It requires agencies to take a "hard look"

at the environmental consequences of proposed actions, but does not mandate

substantive results.  *Id.* (quotation marks omitted).

Under White House Council on Environmental Quality ("CEQ") regulations,

an EIS should discuss the proposed action's "[d]irect effects" and "[i]ndirect

effects."  40 C.F.R. § 1502.16.  "Direct effects" are "caused by the action and

occur at the same time and place."  *Id.* § 1508.8(a).  "Indirect effects" are "caused

by the action and are later in time or farther removed in distance, but are still

reasonably foreseeable."  *Id.* § 1508.8(b).  An agency should also consider the

action's "[c]umulative impact," which is "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions[.]"  *Id.* §§ 1508.7, 1508.25(c).

The NGA designates FERC "as the lead agency for the purposes of ... complying with [NEPA]" for § 3 applications.  15 U.S.C. § 717n(b)(1).  The lead agency supervises the preparation of an EIS where more than one federal agency is involved.  40 C.F.R. § 1501.5(a).  A cooperating agency participates in the EIS's preparation, submits comments to the lead agency, and may ultimately adopt the EIS to fulfill its own NEPA responsibilities if satisfied the EIS adheres to the cooperating agency's comments and recommendations.  *Id.* §§ 1501.6, 1503.2, 1503.3, 1506.3.

### 3.  DOE's Public Interest Determination.

For purposes of liquefied natural gas ("LNG") export authorization, NGA § 3 distinguishes between (1) exports to "a nation with which there is in effect a free trade agreement requiring national treatment for trade in natural gas" ("FTA nations"), and (2) exports to non-FTA nations.  15 U.S.C. § 717b(a), (c).  NGA § 3 directs that applications for FTA-nation exports "shall be granted without modification or delay."  *Id.* § 717b(c).  As to non-FTA nations, DOE "may" grant export applications "with such modification and upon such terms and conditions as [it] may find necessary or appropriate."  *Id.* § 717b(a).

4

DOE's discretion to deny export authorization to non-FTA nations is narrow.  NGA § 3 directs that DOE "shall" authorize LNG exports "unless ... it finds that the proposed exportation ... will not be consistent with the public interest."  *See id*.  This Court has concluded that § 3 establishes a presumption that exports to non-FTA nations are in the public interest.  *See W. Va. Pub. Servs. Comm'n v. DOE*, 681 F.2d 847, 856 (D.C. Cir. 1982) ("[S]ection 3 sets out a general presumption favoring [export] authorization ...."); *Panhandle Producers & Royalty Owners Ass'n v. Econ. Regulatory Admin.*, 822 F.2d 1105, 1111 (D.C. Cir. 1987) ("A presumption favoring [export] authorization, then, is completely consistent with, if not mandated by, the statutory directive.").

## B. FACTUAL BACKGROUND.

### 1. FERC Proceedings.

FERC originally authorized LNG import terminal facilities in Brazoria County, Texas.  In 2011, because of changed market conditions, Freeport LNG Development, L.P. sought FERC authorization for a "Phase II Modification Project" changing previously-authorized facilities.  And in 2012, that party and affiliates sought FERC authorization for LNG export terminal facilities referred to as the "Liquefaction Project" (and, together with the Phase II Modification Project, the "Project") at the same site.

In June 2014, FERC issued a Final EIS.  *See* JA__–__ [Final EIS].  In it, FERC explained that NEPA did not require consideration of environmental impacts from putative export-induced gas production and coal consumption because such impacts were not reasonably foreseeable, and attempting to analyze them would not produce information meaningful for FERC's decisionmaking.  *See* JA__–__, __ [*Id*. at 4-240–4-241, App. L-189].  FERC also explained that it had not addressed the cumulative impacts Sierra Club alleged because they were likewise not reasonably foreseeable.  JA__ [*Id*. at 4-241].

In July 2014, FERC issued an order authorizing the Project to be sited and constructed.  *See Freeport LNG Development, L.P., et al.*, 148 FERC ¶ 61,076 (2014).  FERC noted that an evaluation of issues "associated with the exportation of the commodity natural gas" was within DOE's purview, whereas FERC's review was "limited to the economic and environmental impacts of the proposal" before it.  *Id*. ¶¶ 61,479, 61,480.  It found that "there is no connection between the [Project] and any specific, quantifiable induced production" of natural gas, *id*. ¶ 61,480, and rebutted Sierra Club's arguments on indirect effects and cumulative impacts.  *Id*. ¶¶ 61,484, 61,485.

Sierra Club sought rehearing, which FERC denied in November 2014.  *See Freeport LNG Development, L.P., et al.*, 149 FERC ¶ 61,119 (2014).  Sierra Club then filed a petition for review of the FERC Order in this Court, *Sierra Club &*

*Galveston Baykeeper v. FERC*, No. 14-1275, and oral argument was held on

November 13, 2015.  A decision has not yet been issued.

### 2.  DOE Proceedings.

#### a.      Procedural History.

In separate proceedings before DOE, Freeport LNG Expansion, L.P. and

affiliates ("Freeport"), intervenors here, submitted four applications requesting

authorization to export LNG from the Project.  Two requested authorization to

export to FTA nations,[1] and two to non-FTA nations.[2]  DOE granted Freeport's

FTA-nation applications, authorizing 2.8 Bcf/d (or 1022 bcf/y) of exports.[3]  In

*Freeport LNG Expansion, L.P., et al.*, DOE/FE Order No. 3282-C (2014), DOE

granted Freeport's first non-FTA application, which requested authorization to

export 1.4 Bcf/d.  Sierra Club did not intervene in that proceeding or seek

rehearing or judicial review of Order 3282-C.  Thus, this Court lacks jurisdiction

over that order, which will remain valid regardless of the decision in this case.

This case concerns only Freeport's second non-FTA application (the

"Application"), which it submitted to DOE on December 19, 2011 in DOE/FE Dkt.

---

[1]      DOE/FE Dkt. Nos. 10-160-LNG, 12-06-LNG.

[2]      DOE/FE Dkt. Nos. 10-161-LNG, 11-161-LNG.

[3]      *See Freeport LNG Expansion, L.P. & FLNG Liquefaction, LLC*, DOE/FE Order No. 2913 (2011); *Freeport LNG Expansion, L.P. & FLNG Liquefaction, LLC*, DOE/FE Order No. 3066 (2012).

No. 11-161-LNG.  This Application requested long-term authorization to export an additional 1.4 Bcf/d of LNG to non-FTA nations from the Project.  *See* JA__ [Application 1].  Sierra Club intervened in this proceeding.

On November 15, 2013, DOE issued an order in that proceeding ("Conditional Order") conditionally granting authorization to export up to 0.4 Bcf/d for a 20-year term.  *See* JA__ [*Freeport LNG Expansion, L.P., et al.*, DOE/FE Order No. 3357 at 162 (2013)].[4]   DOE conditioned final authorization on FERC completing its NEPA review.  *See* JA__ –__ [*Id*. at 163–64].  In October 2014, after FERC issued the Final EIS, DOE "conducted an independent review" and adopted the EIS as its own.  79 Fed. Reg. 69,101, 69,103 (Nov. 20, 2014).

In November 2014, DOE issued its Final Opinion and Order ("Authorization Order"), authorizing the export of an additional 0.4 Bcf/d from the Project to non-FTA nations.  *See* JA__, __–__ [*Freeport LNG Expansion, L.P., et al.*, DOE/FE Order No. 3357-B at 8, 107–08 (2014)].  Combined with DOE's prior authorization, Freeport's total non-FTA export authorization equals 1.8 Bcf/d.  *See* JA__–__ [*Id*. at 105–06].  DOE conditioned this authorization on Freeport's

---

[4]    DOE found that 0.4 Bcf/d would—in combination with previously authorized amounts—fill the Project's export capacity, which was also the basis for FERC's NEPA review.  *See* JA__–__, __ [Conditional Order 6–7, 162].

compliance with 83 environmental conditions in the Final EIS.  *See* JA__, __ [*Id.* at 5, 108]; JA__–__ [Final EIS 5-17–5-33].

In the Authorization Order, DOE considered and rejected Sierra Club's objections.  First, DOE concluded that environmental impacts from putative export-induced production were "not 'reasonably foreseeable' within the meaning of [NEPA]."  JA__ [Authorization Order 85].  Second, DOE concluded that the Final EIS's "cumulative impacts" analysis complied with NEPA and did not require evaluation of the impacts of "*all* LNG export applications pending before or approved by DOE."  JA__ [*Id.* at 85].  Lastly, DOE concluded that "the potential negative impacts of [Freeport's] proposed exports are outweighed by the likely net economic benefits and by other non-economic or indirect benefits."  JA__ [*Id.* at 97].  Thus, Sierra Club "failed to overcome the statutory presumption that the proposed export authorization is consistent with the public interest."  JA__ [*Id.* at 98]; *see also* JA__ –__ [*Id.* at 86–87].

Sierra Club sought rehearing, *see* JA__–__ [DOE Reh'g Request], which DOE denied on December 4, 2015 ("Rehearing Order").  *See* JA__–__ [*Freeport LNG Expansion, L.P., et al.*, DOE/FE Order 3357-C (2015)].  On December 22, 2015, Sierra Club filed a petition for review in this Court, seeking review of the Authorization Order (3357-B) and the Rehearing Order (3357-C) relating to the additional 0.4 Bcf/d of capacity.

9

### b.    LNG Export Studies.

While these applications were pending, DOE released four economic and

environmental studies pertaining to its NGA § 3 public-interest authority over

LNG exports to non-FTA nations.  First, it issued a 2012 U.S. Energy Information

Administration study, *Effect of Increased Natural Gas Exports on Domestic*

*Energy Markets* ("2012 EIA Study"), the first of a two-part "Export Study"

intended to inform DOE's duty to ensure that LNG export authorizations "do not

subsequently lead to a reduction in the supply of natural gas needed to meet

essential domestic needs."  77 Fed. Reg. 73,627, 73,628 (Dec. 11, 2012).  This

study examined possible implications of LNG exports on domestic energy markets

under various hypothetical scenarios, which the agency cautioned "were not

forecasts of either the ultimate level, or rates of increase, of exports."  *Id*.  The

projections were "not statements of what ***will*** happen but of what ***might*** happen,

given the assumptions and methodologies used."  JA__ [2012 EIA Study ii].

The study generally found that, "[u]nder the scenarios specified … increased

natural gas exports lead to higher domestic natural gas prices, which lead to

reduced domestic consumption, and increased domestic production …."  JA__ [*Id*.

at 10].  But it cautioned that "projections of energy markets over a 25-year period

are highly uncertain and subject to many events that cannot be foreseen," noting

that "[t]his is particularly true in projecting the effects of exporting significant

natural gas volumes" due to various factors that made the underlying modeling

unsuited to the task.  JA__ [*Id*. at 3].  In 2014, DOE produced an updated version

of this study with similar conclusions.  *See* JA__–__ [2014 EIA Study].

The second part of DOE's Export Study—*Macroeconomic Impacts of LNG*

*Exports from the United States* ("2012 NERA Study")—was produced by NERA

Economic Consulting and analyzed the "macroeconomic impact of LNG exports

on the U.S. economy" under a range of scenarios.  77 Fed. Reg. at 73,628.  It

complemented the 2012 EIA Study, which had projected theoretical export-related

price increases "without, for example, considering whether or not those quantities

of exports could be sold at high enough world prices to support the calculated

domestic prices."  JA__ [2012 NERA Study 3].  This second part found that "the

U.S. was projected to gain net economic benefits from allowing LNG exports," but

also that the highest export-level scenarios—and corresponding prices—considered

by the EIA were "not likely."  JA__, __ [*Id*. at 1, 9].  It, too, acknowledged "great

uncertainties about how the U.S. natural gas market will evolve."  JA__ [*Id*. at 21].

In 2014, DOE issued an *Addendum to Environmental Review Documents*

*Concerning Exports of Natural Gas from the United States* ("*Addendum*") that

summarized unconventional natural gas production activities, and generally

discussed their potential environmental impacts based on a review of existing

literature, regulations, and best management practices.  79 Fed. Reg. 48,132,

48,132 (Aug. 15, 2014); *see* JA__ [*Addendum* 2].  DOE emphasized that the

*Addendum* was "not required by … [NEPA]," 79 Fed. Reg. at 48,132, agreeing

with FERC that upstream "environmental impacts resulting from production

activity induced by LNG exports … are not 'reasonably foreseeable,'" 79 Fed.

Reg. 32,258, 32,259 (June 4, 2014).  Contemporaneously, DOE issued a *Life Cycle*

*Greenhouse Gas Perspective on Exporting Liquefied Natural Gas from the United*

*States* ("*Life Cycle Perspective*") that attempted to compare lifecycle emissions

from U.S. LNG exports used for electric power generation in Europe and Asia with

emissions from coal-generated electricity.  *See* 79 Fed. Reg. 32,260, 32,261 (June

4, 2014); JA__–__ [*Life Cycle Perspective* 1–2].  While this study found that,

under most scenarios, lifecycle emissions attributable to exported LNG were

lower, it emphasized "uncertainty in the underlying modeled data," and stated that

its approach did "not imply the likelihood that LNG export or import will occur" at

a given location.  JA__, __ [*Life Cycle Perspective* 9, 18].

## SUMMARY OF ARGUMENT

The Final EIS, adopted by DOE, considered numerous environmental

impacts that were reasonably foreseeable and proximately caused by the export

authorization under review.  But it reasonably explained that theoretical impacts of

future emissions from increased natural gas production and substituted coal

consumption allegedly induced by price effects that might be caused by exports

from the Project are neither cognizable "indirect effects" nor "cumulative impacts" under NEPA because they are not reasonably foreseeable and are too tenuously connected to the export authorization.  DOE reasonably concluded that its decision would not be meaningfully informed by the speculative prospect of unknown amounts and types of emissions, in unknown locations throughout the world, that may or may not occur over the next quarter-century due to myriad economic, regulatory and technological developments that are unrelated to DOE's limited regulatory role, and that are subject to control by other federal, state and local agencies, and foreign sovereigns.

DOE reasonably determined that such impacts are too speculative to be reasonably foreseeable, given that natural gas production may increase or decrease for reasons unrelated to the Project; the location, timing, and amounts of such production are unknown and subject to regulation by other bodies; and the net worldwide impacts of exporting natural gas cannot reasonably be projected.  The various DOE studies cited by Sierra Club did not, and could not, make specific predictions regarding gas production, and even if some unknown amount of additional production might occur, DOE reasonably concluded that its environmental impacts are not reasonably foreseeable, whether considered by themselves or in conjunction with other pending and issued authorizations. Nevertheless, to the extent DOE was required to engage in such speculation under

13

NEPA (and it was not), the various DOE studies provide as much information as could reasonably be expected and were expressly considered by DOE when making its decision.  NEPA could require no more than that.

Finally, DOE's public interest determination was not arbitrary or capricious, as DOE properly found that Sierra Club had not rebutted the statutory presumption in favor of exports.  DOE reasonably found that the significant benefits of exports were in the public interest and that any environmental issues were more appropriately addressed by the agencies directly tasked with their regulation, rather than by banning exports and forfeiting their substantial benefits.

## STANDARD OF REVIEW

Freeport agrees with the standard of review articulated by DOE.  *See* DOE Br. 33–34.

## ARGUMENT

## I.  DOE'S NEPA ANALYSIS WAS NOT ARBITRARY OR CAPRICIOUS.

Under CEQ regulations, agencies are to evaluate "[d]irect effects" and "[i]ndirect effects" of an action.  40 C.F.R. § 1502.16.  "Indirect effects" are those that are "caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  *Id.* § 1508.8(b).

An "effect" is "reasonably foreseeable" if it is "'sufficiently likely to occur that a person of ordinary prudence would take [it] into account in reaching a

14

decision.'" *City of Dallas, Tex. v. Hall*, 562 F.3d 712, 719 (5th Cir. 2009) (quoting *City of Shoreacres v. Waterworth*, 420 F.3d 440, 453 (5th Cir. 2005)); *see also Sierra Club v. Marsh*, 976 F.2d 763, 767 (1st Cir. 1992). Reasonably foreseeable effects "do[] not include 'highly speculative harms' that 'distort[] the decisionmaking process' by emphasizing consequences beyond those of 'greatest concern to the public and of greatest relevance to the agency's decision.'" *City of Dallas*, 562 F.3d at 719 (second alteration in original) (quoting *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 355–56 (1989)); *see also Marsh*, 976 F.2d at 768 (Agencies "need not consider potential effects that are highly speculative or indefinite."). Thus, while "[r]easonable forecasting" is "implicit in NEPA," NEPA does not require agencies to "'foresee the unforeseeable,'" nor does it "demand forecasting that is 'not meaningfully possible[.]'" *Del. Riverkeeper Network v. FERC*, 753 F.3d 1304, 1310 (D.C. Cir. 2014) (quoting *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1092 (D.C. Cir. 1973)). To require analysis of "highly speculative [and] indefinite" effects, *Marsh*, 976 F.2d at 768, would "demand what is, fairly speaking, not meaningfully possible." *Nat. Res. Def. Council, Inc. v. Morton*, 458 F.2d 827, 837 (D.C. Cir. 1972).

Similarly, NEPA requires "a reasonably close causal relationship between the environmental effect and [an] alleged cause." *Dep't of Transp. v. Public*

15

*Citizen*, 541 U.S. 752, 767 (2004) (quotation marks omitted).  As such, "a 'but for'

causal relationship is insufficient to make an agency responsible for a particular

effect under NEPA and the relevant regulations."  *Id*.  NEPA's causal standard "is

like the familiar doctrine of proximate cause from tort law."  *Metro. Edison Co. v.*

*People Against Nuclear Energy*, 460 U.S. 766, 774 (1983); *see also City of Dallas*,

562 F.3d at 719.

### A.   DOE Properly Found That The Environmental Impacts Alleged By Sierra Club Are Not Reasonably Foreseeable.

Providing the environmental analysis Sierra Club urges would embroil DOE

in a long chain of speculative reasoning that would ultimately be of no use to its

decision-making process.  Sierra Club would require DOE to speculate as to (1)

whether, and by how much, the additional demand that might result from the

Freeport export authorization will increase domestic natural gas prices; (2) what

amount of additional production will result from that unknown price impact; (3)

where that production will occur and what its localized and worldwide

environmental impacts will be; (4) whether and in what amounts domestic natural

gas price increases will spur fuel-switching to coal; (5) where such coal will be

produced and what its environmental impacts will be; and (6) the net increase (or

decrease) in global greenhouse gases arising from such induced natural gas

production, LNG exports, fuel-switching and coal production, considering fuel-

substitution overseas.  DOE reasonably concluded that this analysis was beyond

16

the scope of its NEPA obligation. And in any event, in the studies prepared under

its § 3 authority, DOE fully considered the various hypothetical effects of

additional export-induced production to the extent any of those effects might be

cognizable under NEPA.

### 1. The Location, Quantity, And Impacts Of Export-Induced Gas Production And Coal Use Are Not Reasonably Foreseeable.

As DOE thoroughly explained, "[f]undamental uncertainties constrain [its]

ability to foresee and analyze with any particularity the incremental natural gas

production that may be induced by permitting exports of LNG to non-FTA

countries." *See* JA__ [Authorization Order 84]. Part of this uncertainty arises

from the fact that "[t]he causal relationship Sierra Club posits," is "an economic

one," whereby a decision to authorize LNG exports "may increase the price of

natural gas in the United States," and in turn spur domestic production. *See* JA__

[Reh'g Order 15]; *see*, *e.g.*, Pet. Br. 46.

Sierra Club attacks a straw man, arguing that "[a]n increase in gas

production is [] foreseeable," Pet. Br. 54, and citing Freeport's recognition that

"increas[ed] domestic natural gas production" would be one benefit of the Project.

*Id*. at 18 (citation omitted). DOE, however, did "not dispute the economic logic

that authorizing exports of natural gas ... could, all else equal, exert upward

pressure on domestic natural gas prices," which could spur additional production.

JA__ [Reh'g Order 15]. But even if some induced production were foreseeable as

a general matter, that does not render its environmental *impacts* reasonably

foreseeable.

      To begin with, the theoretical possibility of some unknown marginal price

increase does not render the amount of induced production reasonably foreseeable,

given that it is "fundamentally uncertain how natural gas production at the local

level will respond to price changes at the national level[.]"  JA__ [*Id*. at 17].

Indeed, the 2012 EIA Study—on which Sierra Club so heavily relies—projected

(wrongly, so far) that "U.S. natural gas prices [will] rise over the long run, even

before considering the possibility of additional exports…."  JA__ [2012 EIA Study

6].  Any attempt, then, to determine the level of production that will theoretically

be induced by a marginal increase in exports would be, as DOE concluded, sheer

speculation.

      Just as speculative is "where any additional production would occur."  JA__

[Authorization Order 85]; JA__ [Reh'g Order 19].  Given the interconnected

domestic gas market and pipelines, upward pressure on prices could result in

additional production across the entire United States.  *See* JA__ [Reh'g Order 19].

Thus, merely positing a price increase does not allow DOE to predict with any

certainty where any additional gas production might arise, or how much.  JA__–__

[Authorization Order 84–85]; JA__ [Reh'g Order 19]; *see also, e.g.*, *Border Power*

*Plant Working Grp. v. DOE*, 260 F. Supp. 2d 997, 1027–28 (S.D. Cal. 2003)

(upholding agency decision not to evaluate effects that were nothing "more than a speculative possibility, dependent on the market for electricity and other factors").

Moreover, the overlapping regulatory scheme renders the quantity and location of any increased gas production even more speculative—and the connection between these exports and such production less proximate. *See* JA__ [Reh'g Order 19]. The NGA leaves regulation of the production of natural gas to the states. *See Oneok, Inc. v. Learjet*, *Inc.*, 135 S. Ct. 1591, 1596 (2015); 15 U.S.C. § 717(b). And unlike DOE, federal, state, and local regulators have the "authority to regulate the environmental effects of natural gas production ...." JA__ [Reh'g Order 19]. This diverse, dynamic, and unpredictable web of regulation—impacting production levels directly and indirectly—will ultimately impact where, and in what amount, any induced gas is produced.

Sierra Club also claims that "an incremental shift from gas to coal use in the U.S. electric power sector" is a reasonably foreseeable effect of these exports. *See* Pet. Br. 46; *id.* at 71–74. But DOE reasonably concluded that the connection between its "decision in this proceeding and the level of coal generation in the United States is even more attenuated than its relationship to induced natural gas production." JA__–__ [Reh'g Order 22–23]; DOE Br. 53–54.

The theoretical prospect of the Project's exports inducing higher gas prices, in turn inducing fuel-switching from gas to coal, provides no meaningful

19

information as to environmental *impacts* because the location and amount of such

additional coal use are inherently unknowable.  *See* JA__ –__ [Reh'g Order 22–

23]; *accord* DOE Br. 45–46, 54.   This unforeseeability is further exacerbated by

regulatory uncertainty.  *See* JA__ [Reh'g Order 23].  Indeed, between the issuance

of the Authorization Order and Rehearing Order, the Environmental Protection

Agency ("EPA") finalized rules—now under challenge in this Court—further

regulating emissions from coal-based electricity generation.  *See*  JA__ & n.79 [*Id.*

at 23 & n.79]; 80 Fed. Reg. 64,662 (Oct. 23, 2015); 80 Fed. Reg. 64,510 (Oct. 23,

2015).  These regulations, which this Court may or may not uphold, could not only

reduce emissions from coal-powered electricity generation, but also affect the price

disparity between coal and natural gas.  This renders even more speculative the

location and amount of any coal-switching.[5]

　　Sierra Club relies on the 2012 EIA Study for its prediction that exports will

induce fuel switching to coal, *see* Pet. Br. 71, but that study's projections were

based on "current laws and regulations."  JA__ n.7 [2012 EIA Study 12 n.7].  And

---

[5]     Sierra Club cites *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic
Energy Comm'n*, 449 F.2d 1109 (D.C. Cir. 1971), as holding that regulation by
other agencies is not pertinent.  Pet. Br. 52.  But that is not what *Calvert Cliffs'*
says.  Rather, the Court disapproved an agency's *per se* rule that an action had no
significant impact if the private party was regulated by other entities and was
"equipped to observe and agrees to observe" those other regulations.  449 F.2d at
1122–23.  Nothing comparable is at issue here.  *See* DOE Br. 44–45.

no such study could account for possible regulatory changes over 20 years, much less determine *where* such induced coal use will occur.  Indeed, Sierra Club does not contend that DOE could ever have modeled ozone, water, or other impacts from coal combustion induced by LNG exports.  *See* DOE Br. 54.  And in any event, as to aggregate $CO_2$ impacts from coal use (Pet. Br. 72), the 2012 EIA Study provided broad estimates of potential emissions and this information was disclosed for public review.  *See* DOE Br. 54.[6]

The "[f]undamental uncertainties," JA__ [Authorization Order 84], associated with predicting the quantity and location of any gas production or coal use induced by the Project's exports render any price-induced environmental impacts of such production not "reasonably foreseeable."  As DOE explained, many of the environmental impacts of which Sierra Club complains are "local in nature," and so, without knowing "where any additional production [or coal use] would occur and in what quantity," the environmental impacts from such activities are not reasonably foreseeable.  *See* JA__ [Authorization Order 85]; JA__–__

---

[6]      Sierra Club argues that "[w]here information regarding impacts is unavailable, agencies must nonetheless provide as comprehensive of an analysis as possible."  Pet. Br. 59 (citing 40 C.F.R. § 1502.22(b)(3)–(4)); *id*. at 71.  Section 1502.22, however, does not further Sierra Club's argument.  That regulation applies when an agency is evaluating "***reasonably foreseeable*** significant adverse effects."  40 C.F.R. § 1502.22(b) (emphasis added).  It does not apply where, as here, DOE properly determined that effects are not reasonably foreseeable.

[Reh'g Order 16–19]. This determination was eminently reasonable, and is entitled to deference.[7]

Sierra Club repeatedly argues that the 2012 EIA Study proves that DOE can evaluate how much additional production and coal use will allegedly be induced by the exports at issue here. Pet. Br. 54, 57–58, 71. But while this study informed DOE's public interest review, its projections based on hypotheses do not render those consequences "reasonably foreseeable" under NEPA. As courts have held, "broad statistical data discussing general national trends" that offer "nothing concrete" do not render putative effects reasonably foreseeable. *See Coliseum Square Ass'n, Inc. v. Jackson*, 465 F.3d 215, 238 (5th Cir. 2006).

The 2012 and 2014 EIA studies emphasize that "projections of energy markets over a 25-year period are highly uncertain and subject to many events that

---

[7]     *See, e.g.*, *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 429 (4th Cir. 2012) (NEPA analysis was sufficient where it did not consider "either speculative or relatively inconsequential flyspecks"); *Wyoming v. U.S. Dep't of Agric.*, 661 F.3d 1209, 1253–54 (10th Cir. 2011) (refusing to require agency to consider impacts that were "only speculative in nature"); *City of Dallas*, 562 F.3d at 719–20 (agency not required to consider effects that were "highly speculative" and not "closely enough related to the federal action"); *Border Power Plant*, 260 F. Supp. 2d at 1027–28 (upholding agency decision not to evaluate effects that were nothing "more than a speculative possibility, dependent on the market for electricity and other factors"); *see also Robertson*, 490 U.S. at 356 (NEPA does not require consideration of "highly speculative harms" that "distort[] the decisionmaking process"); *City of Shoreacres*, 420 F.3d at 451–55 (agency not required to evaluate deepening of water channel as it was "too speculative to warrant consideration").

cannot be foreseen," and that this is "particularly true in projecting the effects of exporting significant natural gas volumes from the United States…."  JA__ [2012 EIA Study 3]; *see also* JA__ [2014 EIA Study 10].  Given the "high[] uncertain[ty]" of this endeavor, the EIA cautioned that "[t]he projections in this report,"—including those relied upon by Sierra Club here—"are not statements of what ***will*** happen but of what ***might*** happen, given the assumptions and methodologies used."  JA__ [2012 EIA Study ii]; *see also* JA__ [2014 EIA Study 11] (2012 EIA Study's limitations "also appl[y] to the analysis contained in this updated report").

As DOE notes, the National Energy Modeling System ("NEMS") cannot reasonably estimate or assess environmental impacts from induced natural gas production.  *See* DOE Br. 45–47; *cf*. Pet. Br. 23, 55–57, 72.  Indeed, the 2012 EIA Study, which utilized NEMS, itself recognized that there was "particular[]" uncertainty in "projecting the effects of exporting significant natural gas volumes," because: (1) NEMS "is not a world energy model and does not address the interaction between the potential for additional U.S. natural gas exports and developments in the world natural gas markets"; (2) NEMS's "energy and macroeconomic models … do not include energy exports"; and (3) NEMS's "domestic focus makes it unable to account for all interactions between energy

prices and supply/demand in energy-intensive industries that are globally competitive." JA__ [2012 EIA Study 3].

This case is thus different from *Mid States Coalition for Progress v. Surface Transportation Board*, 345 F.3d 520 (8th Cir. 2003). There, the Surface Transportation Board ("STB") declined to analyze the foreseeable indirect effects of increased coal use from the construction of a rail line creating access to a coal supply. *Id*. at 532, 548–50. But the location and amount of coal being mined (and subsequently burned) was known, the agency had admitted the "likely shift" to coal that the project would cause, *id*. at 548–49, and the agency had indicated that it would evaluate the "potential air quality impacts associated with" the increased coal supply, but "failed to deliver on this promise." *Id*. at 550. For these reasons, the Eighth Circuit could conclude that it was "almost certainly true" that increased coal use and requisite emissions would occur. *Id*. at 549.

Here, by contrast, neither the quantities nor locations of export-induced gas production or coal use, nor their putative environmental impacts, are known. DOE has consistently maintained that it lacks sufficient information and tools to meaningfully predict or analyze these putative effects, and has never, unlike the STB in *Mid States*, represented that it would do so. *See also Habitat Educ. Ctr. v. U.S. Forest Serv.*, 609 F.3d 897, 902 (7th Cir. 2010) (distinguishing *Mid States* because the STB had "concluded that adverse effects from the readily foreseeable

24

increase in coal sales were certain to occur," whereas the impacts at issue in that

case were not "capable of meaningful discussion").[8]

Similar features also distinguish *High Country Conservation Advocates v.*

*United States Forest Service*, 52 F. Supp. 3d 1174 (D. Colo. 2014).  There, an

agency declined to analyze foreseeable greenhouse gas emissions caused by a rule

authorizing a road for additional coal mining.  *Id*. at 1184, 1195–98.  But the

agency's rule "explicitly state[d] that one of its purposes [was] to facilitate coal

mining and exploration," *id*. at 1184, it "possess[ed] data" regarding three mines

that were "the only ones that will be expanded under the rule," *id*. at 1195–96, and

---

[8]     None of the other cases on which Sierra Club relies is on point.  *See* Pet. Br. 47–48.  Each involved review of a decision that there was no "significant impact" requiring an EIS, and the agencies either offered no explanation for failing to consider indirect effects, or the record contained specific information that allowed the agency to do so.  *See Barnes v. U.S. Dep't of Transp.*, 655 F.3d 1124, 1137–39 (9th Cir. 2011) (reversing Finding of No Significant Impact ("FONSI") where agency offered conclusory assertions for why additional airport runway would not increase air-traffic demand even though "a new runway has a unique potential to spur demand"); *Sierra Club v. Marsh*, 769 F.2d 868, 878–79 (1st Cir. 1985) (reversing FONSI where agency did not analyze the indirect effect of "further industrial development" because, *inter alia*, "the record ma[de] it nearly impossible to doubt that building the causeway and port will lead to further development," and "plans for further development [were] precise" and contained "detailed descriptions of likely further development"); *City of Davis v. Coleman*, 521 F.2d 661, 673–76 (9th Cir. 1975) (reversing FONSI because it was "obvious" that proposed interchange would cause further development); *Friends of the Earth, Inc. v. U.S. Army Corps of Eng'rs*, 109 F. Supp. 2d 30, 41 (D.D.C. 2000) (reversing FONSI for development where the record "firmly establish[ed] that increased growth … [was] the only reasonable prediction of what [would] occur" and the agency had "acknowledged that increased development" was likely).

it had "provide[d] detailed estimates of the amount of coal to be mined," and so could not claim that additional production was "too speculative." *Id*. at 1196–97.

DOE, by contrast, cannot know the quantity, or location of, or emissions from, any putative induced gas production or coal use that might be spurred by possible price effects from LNG exports, and has not "provide[d] detailed estimates" of any of these. *Cf. id*. at 1196. At bottom, Sierra Club's desired analysis would require a boundless inquiry, whereby an agency would need to predict the amounts and location, and specific environmental consequences, of any marginal increase in use of a product, as well as substitute products, that might be attributable to price effects resulting from some government action. JA__ [Reh'g Order 23]. This highly speculative analysis would provide no meaningful information for DOE's decisionmaking. It was therefore not arbitrary or capricious for DOE to conclude that such speculative predictions do not render the effects cognizable under NEPA.

### 2. DOE's Consideration Of Local Impacts Was Reasonable.

#### a. DOE's Consideration Of Ozone And Water Impacts Was Reasonable.

As DOE noted, "nearly all of the environmental issues presented by [gas production] are local in nature ...." JA__ [Authorization Order 85]; *see also* JA__ [*Addendum* 2]. As a consequence, because "[t]here is [] fundamental uncertainty as to where any additional production would occur and in what quantity," JA__

26

[Authorization Order 85], any analysis of such impacts would be "highly speculative [and] indefinite." *Marsh*, 976 F.2d at 768.

Sierra Club argues that DOE should have evaluated water and ozone emission impacts allegedly induced by LNG exports, claiming that these "impacts are not purely 'local,'" because some "effects occur at regional" levels. Pet. Br. 59–60; *id*. at 63–66 (water impacts); *id*. at 66–71 (ozone impacts). But DOE reasonably determined that such an analysis would "be more misleading than informative." JA__ [Reh'g Order 17]; JA__–__ [*id*. at 16–19]. As DOE explained, "shale plays … overlap and stretch for thousands of square miles below diverse surface environments." JA__ [*Id*. at 18]. So while these large areas can be used for some economic projections, "their size [] makes them less useful units for analyzing impacts to environmental resources such as air, water, or land." JA__ [*Id*.] (footnotes omitted); *cf*. Pet. Br. 65. As a consequence, utilizing economic models that "estimate[] induced production across each shale play," as Sierra Club urges, "would provide no information about where any incremental production would arise ***within*** those shale plays," and so "would not render the environmental impacts of such production reasonably foreseeable in a manner that would facilitate meaningful analysis." *See* JA__–__ [Reh'g Order 18–19] (emphasis added).

27

This is true as to ozone impacts, whose "play-level" evaluation DOE reasonably concluded was not meaningfully possible. JA__ n.68 [Reh'g Order 18 n.68]. Sierra Club argues that "DOE has the tools to assess the impact of these [ozone] increases at a regional level." Pet. Br. 69. But the regions of possible gas production that Sierra Club identifies are not coterminous with existing areas of high-ozone concentration. JA__ n.68 [Reh'g Order 18 n.68]. As DOE noted, the nature and extent of ozone impacts vary from area to area. *Id.* So even if DOE knew that export-induced production would occur somewhere within a particular shale play—which it does not—it would still need to know *where* in that play the production would occur. Because this information is unknowable, "the play-level modeling Sierra Club urges would not enable [DOE] to characterize the environmental and human health impacts posed by [putative export-induced] production." *Id.*

The study Sierra Club cites (Pet. Br. 69) concedes the uncertainty of its estimate of increased production in the evaluated region, and that it depended on existing laws remaining constant. *See* Susan Kemball-Cook, *et al.*, *Ozone Impacts of Natural Gas Development in the Haynesville Shale*, 44 Envtl. Sci. & Tech. 9357, 9359, 9362 (2010). This uncertainty would only have been magnified had DOE attempted to differentiate between emissions caused by export-induced production, and ozone emissions caused by increased production generally. Nor

does a draft EIS prepared by a different agency show that "regional analysis of ozone impacts [is] possible."  Pet. Br. 70 (citing Bureau of Land Management, *Continental Divide-Creston Natural Gas Development Project*, *Draft EIS*, ES-1, ES-3 (Nov. 2012)) ("BLM DEIS").  That project involved "approximately 8,950 new natural gas wells" within a specified project area.  BLM DEIS at ES-1.  Thus, the agency knew where and in what amounts the natural gas production would occur.  That is precisely the information that DOE lacks here, and it is this absence of information that renders such a "regional" analysis not meaningfully possible.

It was therefore reasonable for DOE to conclude that "without knowing where, in what quantity, and under what circumstances additional gas production will arise," the water and ozone impacts from putative export-induced production "are not 'reasonably foreseeable[.]'"  JA__ [Authorization Order 85]; JA__–__ [Reh'g Order 16–19]; JA__–__ [*Addendum* 1–2].

### b. DOE's Consideration of Greenhouse Gas Emissions Was Reasonable.

Sierra Club next argues that DOE did not "take a hard look at the amount of greenhouse gases that would be emitted by induced natural gas production, processing, and transport."  Pet. Br. 60–63.  Sierra Club is wrong.  *See* DOE Br. 56–57.  Sierra Club's estimate regarding the greenhouse gas emissions that would follow from the Project's exports relies, at bottom, on the 2012 EIA Study.  *See, e.g.*, Pet. Br. 61.  But that study's estimates were "highly uncertain."  JA__ [2012

EIA Study 3]. And natural gas production is subject to regulatory forces at the state and local level—and by emissions regulations at the federal level. *Supra* at 19-20. These factors, among others, prevent any reasonably foreseeable estimate of the amount of gas production induced by exports (much less the 0.4 Bcf/d of exports solely at issue here).

Moreover, the environmental impacts of greenhouse gas emissions allegedly induced by LNG exports are ultimately felt worldwide. "Greenhouse gases once emitted become well mixed in the atmosphere; emissions in New Jersey may contribute no more to flooding in New York than emissions in China." *Am. Elec. Power Co. v. Connecticut*, 564 U.S. 410, 422 (2011) (citation and quotation marks omitted). Even if it were possible to reasonably foresee the quantity of U.S. greenhouse gas emissions from export-induced natural gas production—and it is not—an assessment of the environmental impacts would have to take account of how the LNG is used abroad and what other fuels it would displace. As DOE reasonably concluded, this inherently speculative inquiry would provide no meaningful information for the decision at hand.

Sierra Club nevertheless criticizes DOE's consideration of global greenhouse gas emissions vis-à-vis overseas markets. *See* Pet. Br. 74–76. As an initial matter, this argument is jurisdictionally barred. *See* 15 U.S.C. § 717r(b). Before DOE, Sierra Club explicitly framed this criticism as an argument under

NGA § 3, not NEPA.  *See* JA__–__ [DOE Reh'g Request 20–21].  Thus, Sierra

Club did not "urge[]" this objection before DOE.  *See* 15 U.S.C. § 717r(b);

*Intermountain Mun. Gas Agency v. FERC*, 326 F.3d 1281, 1285 (D.C. Cir. 2003)

(objection must "be specifically urged") (quotation marks and alterations omitted).

     In any event, the argument is meritless.  In the Authorization Order, DOE

relied on the *Lifecycle Analysis* to conclude that "to the extent U.S. LNG exports

are preferred over coal in LNG-importing nations, U.S. LNG exports are likely to

reduce global GHG emissions."  JA__ [Authorization Order 92].  DOE noted that

this analysis was helpful to its public interest determination because a large portion

of electricity generation in China, India, Japan, and Europe is coal-based.  *See*

JA__ [*Id*. at 93].  Sierra Club latches onto DOE's characterization of natural gas as

a "prevalent fuel" in these countries, arguing that DOE should have compared the

possible substitution of U.S. LNG for wind, solar, or other renewable power

sources—which Sierra Club contends are "far more prevalent" than LNG.  Pet. Br.

75–76.  But DOE reasonably compared coal and natural gas because coal is the

most prevalent fuel-source for electricity generation in these countries.  *See* JA__

& nn.218–20 [Authorization Order 93 & nn.218–20].  Indeed, when Sierra Club

itself analyzes fuel-switching in the U.S., it likewise analyzes only coal.  Pet. Br.

71–74.

In any event, modeling the effect that "U.S. LNG exports would have on net global GHG emissions would require projections of how each of these fuel sources would be affected in each LNG-importing nation" and consideration of "the market dynamics in each of these countries over the coming decades" and "the interventions of numerous foreign governments in those markets."  JA__ [Authorization Order 93].  It was entirely reasonable for DOE to conclude that the vast uncertainties inherent in such analysis would render it "too speculative."  *Id.* Not only would DOE have to project the emissions over 20 years induced by hypothetical price effects caused by LNG exports, but it would have to balance those speculative amounts against the exponentially more speculative effects of using natural gas in numerous foreign countries, even though the destinations of the exports from the Project are unknown and each country has its own market, regulatory, and technological uncertainties.  At bottom, anything derived from such hypothetical analyses would be little different from picking a number out of a hat, and so would not meaningfully effect DOE's decisionmaking.

Sierra Club's real objection is that environmental concerns should have led DOE to entirely deny exports to non-FTA nations.  But in its § 3 determination, DOE rejected that contention as a policy matter, concluding that "the public interest is better served by addressing these environmental concerns directly— through federal, state, or local regulation, or through self-imposed industry

guidelines where appropriate—rather than by prohibiting exports of natural gas."

JA__–__ [Authorization Order 86–87]. That is because "[u]nlike DOE,

environmental regulators have the legal authority to impose requirements on

natural gas production that appropriately balance benefits and burdens, and to

update these regulations from time to time as technological practices and scientific

understanding evolve." JA__ [*Id.* at 87].

Accordingly, the highly speculative, 20-year, worldwide, multi-fuel,

economic, regulatory, and price-impact environmental analysis that Sierra Club

would have DOE perform would ultimately provide nothing meaningful for its

decision whether to authorize exports from this particular facility. DOE therefore

properly focused its analysis on the specific, quantifiable environmental impacts

that the Project would have on its own region. And as DOE also notes, the

exhaustive studies that DOE considered in its § 3 analysis—while not

demonstrating reasonable foreseeability—provide as much information on the

theoretical impacts of potential induced production as is reasonably possible.

## B.    DOE's Cumulative Impacts Analysis Was Reasonable.

Sierra Club argues that DOE's "cumulative impacts" analysis should have

evaluated the environmental impacts of ***all*** pending and previously authorized

LNG export applications in conjunction with the order under review here. *See* Pet.

Br. 2, 43–45.

33

A cumulative impacts analysis, however, need only consider impacts from reasonably foreseeable actions that are ***themselves*** reasonably foreseeable. CEQ regulations define a "cumulative impact" as "the ***impact*** on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions…." 40 C.F.R. § 1508.7 (emphasis added). An effect (or impact[9]) is one that "occur[s] at the same time and place" as the action, *id*. § 1508.8(a) (direct effect), or is "later in time or farther removed" but "still reasonably foreseeable." *Id*. § 1508.8(b) (indirect effect). Thus, DOE's "obligation under NEPA to consider cumulative impacts is confined to impacts that are 'reasonably foreseeable.'" *City of Shoreacres*, 420 F.3d at 453; *see also Del. Riverkeeper*, 753 F.3d at 1319 (cumulative impact analysis need only consider "expected impacts from [] other actions") (quotation marks omitted); *Wyoming*, 661 F.3d at 1253 (same).

As already discussed, the environmental impacts from production that might be induced by this particular export authorization are not reasonably foreseeable. Accordingly, the ***cumulative*** impacts from gas production induced by all other exports are *a fortiori* not reasonably foreseeable either. As such, the Final EIS was not required to consider such impacts. *Cf. Town of Cave Creek, Ariz. v. F.A.A.*,

---

9      "Effects" and "impacts" are synonymous. 40 C.F.R. § 1508.8.

325 F.3d 320, 331 (D.C. Cir. 2003) (cumulative impact analysis was not required to include "difficult ... as well as increasingly inaccurate ... projections").

Sierra Club argues that DOE's "request for programmatic studies of exports' effects on [U.S.] gas supply and the economy" shows that each export approval would pose significant cumulative impacts. Pet. Br. 43. But DOE does not deny that exports, considered collectively, could have broad effects. That possibility, however, does not render those speculative consequences "cumulative impacts" under the regulations because none of the particular environmental impacts are themselves reasonably foreseeable. Cumulating unforeseeable impacts only results in more speculation. As DOE recognized, Sierra Club's objection to DOE's cumulative impacts analysis is, in reality, an argument that FERC should produce a "programmatic EIS" covering all LNG exports, *see* 40 C.F.R. § 1502.4(b), but there is no such "program." JA__–__ [Authorization Order 85–86].

Given the speculative nature of the analysis Sierra Club urges, FERC and DOE reasonably limited the geographic scope of their cumulative impacts analysis to Brazoria County, *see* JA__–__, __–__ [Final EIS 4-240–4-242, Table 4.12.3-1– 4.12.3-2], since this is where "the predominance of [cognizable] environmental impacts occur[.]" JA__ [*Id.* at 4-240]; *see Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010) (cumulative impact analysis must "assess the impact the proposed project will have in conjunction with other

projects *in the same and surrounding areas*") (emphasis added); *see also Blue*

*Mountains Biodiversity Project v. Blackwood*, 161 F.3d 1208, 1215 (9th Cir. 1998)

("'determination of the extent and effect of [cumulative impact] factors, *and*

*particularly identification of the geographic area within which they may occur*,

is a task assigned to the special competency of the appropriate agencies'")

(emphasis added) (quoting *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976)).  The

Final EIS's cumulative impacts analysis of the actions within this geographic area

was eminently reasonable, *see* JA__–__ [Final EIS 4-240–4-266], and Sierra Club

has not argued otherwise.

## II.    DOE'S PUBLIC INTEREST ANALYSIS WAS NOT ARBITRARY OR CAPRICIOUS.

DOE's § 3 "public interest" determination is reviewed under the deferential

"arbitrary and capricious" standard.  *See Wash. Gas Light Co. v. FERC*, 532 F.3d

928, 930 (D.C. Cir. 2008).  DOE has effectively rebutted Sierra Club's § 3

objections.  *See* DOE Br. 59–61.  Sierra Club's argument (Pet. Br. 77–79) ignores

the presumption in favor of export authorization, and then misconstrues DOE's

analysis under that presumption.

Sierra Club proceeds from the mistaken premise that § 3 requires DOE to

make an affirmative case *for* export authorization that outweighs Sierra Club's

contrary case.  But the statute imposes a presumption that exports are in the public

interest by directing that DOE "shall" authorize exports "*unless* … it finds that the

proposed exportation … will ***not*** be consistent with the public interest." 15 U.S.C.

§ 717b(a) (emphasis added); *see Panhandle*, 822 F.2d at 1111; *W. Va. Pub. Servs.*

*Comm'n*, 681 F.2d at 856; JA__–__ [Reh'g Order 10–11]. Thus, Sierra Club has

the burden to make "an ***affirmative showing of inconsistency*** with the public

interest" that rebuts the statutory presumption. *Panhandle*, 822 F.2d at 1111

(emphasis added).

Under this standard, DOE's public interest analysis was reasonable. DOE

identified and considered a wide range of benefits from LNG export authorization,

JA__, __–__ [Authorization Order 87, 94–97], including job creation, tax

revenues, and other direct and indirect economic benefits. *See* JA__ [*Id*. at 87];

JA__–__ [Conditional Order 27–28]. That LNG exports could have a positive

economic impact on the U.S. economy was affirmed by the NERA study, which

forecast "net economic benefits" from issuance of export authorizations. JA__

[Authorization Order 94]; *see also* JA__ [2012 NERA Study 1].

DOE further concluded that authorizing exports would be consistent with the

public interest "for reasons that are distinct from and additional to the economic

benefits," JA__ [Authorization Order 96], including by facilitating global fuel-

diversification, providing "strategic benefits" through "improv[ing] energy security

for many U.S. allies and trading partners," and by potentially reducing global

37

greenhouse gas emissions through providing foreign nations with a lower-emission alternative.  See JA__, __ [*Id*. at 94, 96].

DOE also reasonably concluded that § 3 "is too blunt an instrument to address [Sierra Club's] environmental concerns efficiently."  JA__ [*Id*. at 87]. Disallowing exports, as Sierra Club urges, "would … forego entirely the economic and international benefits [of exports] … but would have little more than a modest, incremental impact on the environmental issues identified by Sierra Club and others."  *Id*.  Given that other agencies directly regulate environmental concerns, the "economic and international benefits" of exports can be realized while also mitigating the environmental impacts of gas production through such direct regulation.  *See* JA__–__ [*Id*. at 86–87].[10]

Sierra Club objects that DOE "did not 'attempt to identify or characterize the incremental environmental impacts' of exports[.]"  *See* Pet. Br. 77 (quoting JA__ [Authorization Order 84]).  This objection is identical to Sierra Club's NEPA arguments.  Pet. Br. 41–76.  But since those environmental impacts "cannot be analyzed with any particularity," JA__ [Authorization Order 84], it could hardly

---

10      Freeport agrees with DOE that § 3 does not impose a "formal cost-benefit analysis."  *Cf*. Pet. Br. 77–78.  To support this argument, Sierra Club cites *Motor Vehicles Manufacturers Ass'n of the U.S. v. State Farm Mutual Automobile Insurance Co.*, 463 U.S. 29, 52 (1983), which is not a NEPA case and does not involve NGA § 3's public interest standard.

have been "inherently arbitrary," Pet. Br. 77, for DOE to have declined to consider

environmental impacts that cannot be measured in any meaningful degree.  *See*

DOE Br. 35–59; *supra* at 14-36.

## CONCLUSION

For these reasons, and those stated by DOE, the petition for review should

be denied.  Alternatively, if this Court concludes that additional analysis is

required, the Court should remand without vacatur.  *See, e.g.*, *Black Oak Energy,*

*LLC v. FERC*, 725 F.3d 230, 244 (D.C. Cir. 2013).

Respectfully submitted,

/s/ Jonathan S. Franklin

| | |
|---|---|
| Lisa M. Tonery | Jonathan S. Franklin |
| NORTON ROSE FULBRIGHT US LLP | NORTON ROSE FULBRIGHT US LLP |
| 666 Fifth Ave. | 799 9th St., N.W. |
| New York, N.Y. 10103 | Washington, D.C. 20001 |
| (212) 318-3278 | (202) 662-0466 |
| | jonathan.franklin@nortonrosefulbright.com |
| | |
| | Counsel for Freeport LNG Expansion, L.P., |
| | FLNG Liquefaction, LLC, FLNG |
| | Liquefaction 2, LLC, and FLNG |
| June 7, 2016 | Liquefaction 3, LLC |

## CERTIFICATE OF COMPLIANCE

This brief complies with the type-volume limitations of D.C. Cir. R.

32(a)(2)(B) because this brief contains 8,749 words, excluding the parts of the

brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the

typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements

of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally

spaced typeface using Microsoft Word 2010 in 14-point Times New Roman

typeface.

/s/ Jonathan S. Franklin
Jonathan S. Franklin

Counsel for Freeport LNG Expansion,
L.P., FLNG Liquefaction, LLC, FLNG
Liquefaction 2, LLC, and FLNG
Liquefaction 3, LLC

## CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the District of Columbia Circuit by using the appellate CM/ECF system on June 7, 2016.

I certify that all participants in the case are registered CM/ECF users, and that service will be accomplished by the appellate CM/ECF system.

/s/ Jonathan S. Franklin
Jonathan S. Franklin

Counsel for Freeport LNG Expansion, L.P., FLNG Liquefaction, LLC, FLNG Liquefaction 2, LLC, and FLNG Liquefaction 3, LLC

# ADDENDUM

## TABLE OF CONTENTS

Addendum Page

**Statutes**

15 U.S.C. § 717 .................................................................................1

15 U.S.C. § 717n ...............................................................................3

15 U.S.C. § 717r ...............................................................................5

42 U.S.C. § 7151 ...............................................................................8

42 U.S.C. § 7172 .............................................................................11

**Regulations**

40 C.F.R. § 1501.5 ...........................................................................14

40 C.F.R. § 1501.6 ...........................................................................14

40 C.F.R. § 1502.4 ...........................................................................16

40 C.F.R. § 1502.16 .........................................................................18

40 C.F.R. § 1502.22 .........................................................................20

40 C.F.R. § 1503.2 ...........................................................................21

40 C.F.R. § 1503.3 ...........................................................................21

40 C.F.R. § 1506.3 ...........................................................................23

40 C.F.R. § 1508.25 .........................................................................25

**Other**

DOE, Re-Delegation Order, No. 00-006.02 (Nov. 17, 2014)..................27

DOE, Delegation Order, No. 00-004.00A (May 16, 2006) ....................33

TITLE 15—COMMERCE AND TRADE

## § 715l. Repealed. June 22, 1942, ch. 436, 56 Stat. 381

Section, acts Feb. 22, 1935, ch. 18, §13, 49 Stat. 33; June 14, 1937, ch. 335, 50 Stat. 257; June 29, 1939, ch. 250, 53 Stat. 927, provided for expiration of this chapter on June 30, 1942.

## § 715m. Cooperation between Secretary of the Interior and Federal and State authorities

The Secretary of the Interior, in carrying out this chapter, is authorized to cooperate with Federal and State authorities.

(June 25, 1946, ch. 472, §3, 60 Stat. 307.)

### CODIFICATION

Section was not enacted as a part act Feb. 22, 1935, which comprises this chapter.

### DELEGATION OF FUNCTIONS

Delegation of President's authority to Secretary of the Interior, see note set out under section 715j of this title.

## CHAPTER 15B—NATURAL GAS

| Sec. | |
|---|---|
| 717. | Regulation of natural gas companies. |
| 717a. | Definitions. |
| 717b. | Exportation or importation of natural gas; LNG terminals. |
| 717b–1. | State and local safety considerations. |
| 717c. | Rates and charges. |
| 717c–1. | Prohibition on market manipulation. |
| 717d. | Fixing rates and charges; determination of cost of production or transportation. |
| 717e. | Ascertainment of cost of property. |
| 717f. | Construction, extension, or abandonment of facilities. |
| 717g. | Accounts; records; memoranda. |
| 717h. | Rates of depreciation. |
| 717i. | Periodic and special reports. |
| 717j. | State compacts for conservation, transportation, etc., of natural gas. |
| 717k. | Officials dealing in securities. |
| 717l. | Complaints. |
| 717m. | Investigations by Commission. |
| 717n. | Process coordination; hearings; rules of procedure. |
| 717o. | Administrative powers of Commission; rules, regulations, and orders. |
| 717p. | Joint boards. |
| 717q. | Appointment of officers and employees. |
| 717r. | Rehearing and review. |
| 717s. | Enforcement of chapter. |
| 717t. | General penalties. |
| 717t–1. | Civil penalty authority. |
| 717t–2. | Natural gas market transparency rules. |
| 717u. | Jurisdiction of offenses; enforcement of liabilities and duties. |
| 717v. | Separability. |
| 717w. | Short title. |
| 717x. | Conserved natural gas. |
| 717y. | Voluntary conversion of natural gas users to heavy fuel oil. |
| 717z. | Emergency conversion of utilities and other facilities. |

## § 717. Regulation of natural gas companies

### (a) Necessity of regulation in public interest

As disclosed in reports of the Federal Trade Commission made pursuant to S. Res. 83 (Seventieth Congress, first session) and other reports made pursuant to the authority of Congress, it is declared that the business of transporting and selling natural gas for ultimate distribution to the public is affected with a public interest, and that Federal regulation in matters relating to the transportation of natural gas and the sale thereof in interstate and foreign commerce is necessary in the public interest.

### (b) Transactions to which provisions of chapter applicable

The provisions of this chapter shall apply to the transportation of natural gas in interstate commerce, to the sale in interstate commerce of natural gas for resale for ultimate public consumption for domestic, commercial, industrial, or any other use, and to natural-gas companies engaged in such transportation or sale, and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation, but shall not apply to any other transportation or sale of natural gas or to the local distribution of natural gas or to the facilities used for such distribution or to the production or gathering of natural gas.

### (c) Intrastate transactions exempt from provisions of chapter; certification from State commission as conclusive evidence

The provisions of this chapter shall not apply to any person engaged in or legally authorized to engage in the transportation in interstate commerce or the sale in interstate commerce for resale, of natural gas received by such person from another person within or at the boundary of a State if all the natural gas so received is ultimately consumed within such State, or to any facilities used by such person for such transportation or sale, provided that the rates and service of such person and facilities be subject to regulation by a State commission. The matters exempted from the provisions of this chapter by this subsection are declared to be matters primarily of local concern and subject to regulation by the several States. A certification from such State commission to the Federal Power Commission that such State commission has regulatory jurisdiction over rates and service of such person and facilities and is exercising such jurisdiction shall constitute conclusive evidence of such regulatory power or jurisdiction.

### (d) Vehicular natural gas jurisdiction

The provisions of this chapter shall not apply to any person solely by reason of, or with respect to, any sale or transportation of vehicular natural gas if such person is—

(1) not otherwise a natural-gas company; or
(2) subject primarily to regulation by a State commission, whether or not such State commission has, or is exercising, jurisdiction over the sale, sale for resale, or transportation of vehicular natural gas.

(June 21, 1938, ch. 556, §1, 52 Stat. 821; Mar. 27, 1954, ch. 115, 68 Stat. 36; Pub. L. 102–486, title IV, §404(a)(1), Oct. 24, 1992, 106 Stat. 2879; Pub. L. 109–58, title III, §311(a), Aug. 8, 2005, 119 Stat. 685.)

### AMENDMENTS

2005—Subsec. (b). Pub. L. 109–58 inserted "and to the importation or exportation of natural gas in foreign commerce and to persons engaged in such importation or exportation," after "such transportation or sale,".

USCA Case #15-1489   Document #1617338   Filed: 06/07/2016   Page 59 of 94

1992—Subsec. (d). Pub. L. 102–486 added subsec. (d).
1954—Subsec. (c). Act Mar. 27, 1954, added subsec. (c).

TERMINATION OF FEDERAL POWER COMMISSION;
TRANSFER OF FUNCTIONS

Federal Power Commission terminated and functions, personnel, property, funds, etc., transferred to Secretary of Energy (except for certain functions transferred to Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a), 7291, and 7293 of Title 42, The Public Health and Welfare.

STATE LAWS AND REGULATIONS

Pub. L. 102–486, title IV, § 404(b), Oct. 24, 1992, 106 Stat. 2879, provided that: "The transportation or sale of natural gas by any person who is not otherwise a public utility, within the meaning of State law—

"(1) in closed containers; or

"(2) otherwise to any person for use by such person as a fuel in a self-propelled vehicle,

shall not be considered to be a transportation or sale of natural gas within the meaning of any State law, regulation, or order in effect before January 1, 1989. This subsection shall not apply to any provision of any State law, regulation, or order to the extent that such provision has as its primary purpose the protection of public safety."

EMERGENCY NATURAL GAS ACT OF 1977

Pub. L. 95–2, Feb. 2, 1977, 91 Stat. 4, authorized President to declare a natural gas emergency and to require emergency deliveries and transportation of natural gas until the earlier of Apr. 30, 1977, or termination of emergency by President and provided for antitrust protection, emergency purchases, adjustment in charges for local distribution companies, relationship to Natural Gas Act, effect of certain contractual obligations, administrative procedure and judicial review, enforcement, reporting to Congress, delegation of authorities, and preemption of inconsistent State or local action.

EXECUTIVE ORDER NO. 11969

Ex. Ord. No. 11969, Feb. 2, 1977, 42 F.R. 6791, as amended by Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, which delegated to the Secretary of Energy the authority vested in the President by the Emergency Natural Gas Act of 1977 except the authority to declare and terminate a natural gas emergency, was revoked by Ex. Ord. No. 12553, Feb. 25, 1986, 51 F.R. 7237.

PROCLAMATION NO. 4485

Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, declared that a natural gas emergency existed within the meaning of section 3 of the Emergency Natural Gas Act of 1977, set out as a note above, which emergency was terminated by Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, formerly set out below.

PROCLAMATION NO. 4495

Proc. No. 4495, Apr. 1, 1977, 42 F.R. 18053, terminated the natural gas emergency declared to exist by Proc. No. 4485, Feb. 2, 1977, 42 F.R. 6789, formerly set out above.

## § 717a. Definitions

When used in this chapter, unless the context otherwise requires—

(1) "Person" includes an individual or a corporation.

(2) "Corporation" includes any corporation, joint-stock company, partnership, association, business trust, organized group of persons, whether incorporated or not, receiver or receivers, trustee or trustees of any of the foregoing, but shall not include municipalities as hereinafter defined.

(3) "Municipality" means a city, county, or other political subdivision or agency of a State.

(4) "State" means a State admitted to the Union, the District of Columbia, and any organized Territory of the United States.

(5) "Natural gas" means either natural gas unmixed, or any mixture of natural and artificial gas.

(6) "Natural-gas company" means a person engaged in the transportation of natural gas in interstate commerce, or the sale in interstate commerce of such gas for resale.

(7) "Interstate commerce" means commerce between any point in a State and any point outside thereof, or between points within the same State but through any place outside thereof, but only insofar as such commerce takes place within the United States.

(8) "State commission" means the regulatory body of the State or municipality having jurisdiction to regulate rates and charges for the sale of natural gas to consumers within the State or municipality.

(9) "Commission" and "Commissioner" means the Federal Power Commission, and a member thereof, respectively.

(10) "Vehicular natural gas" means natural gas that is ultimately used as a fuel in a self-propelled vehicle.

(11) "LNG terminal" includes all natural gas facilities located onshore or in State waters that are used to receive, unload, load, store, transport, gasify, liquefy, or process natural gas that is imported to the United States from a foreign country, exported to a foreign country from the United States, or transported in interstate commerce by waterborne vessel, but does not include—

(A) waterborne vessels used to deliver natural gas to or from any such facility; or

(B) any pipeline or storage facility subject to the jurisdiction of the Commission under section 717f of this title.

(June 21, 1938, ch. 556, § 2, 52 Stat. 821; Pub. L. 102–486, title IV, § 404(a)(2), Oct. 24, 1992, 106 Stat. 2879; Pub. L. 109–58, title III, § 311(b), Aug. 8, 2005, 119 Stat. 685.)

AMENDMENTS

2005—Par. (11). Pub. L. 109–58 added par. (11).
1992—Par. (10). Pub. L. 102–486 added par. (10).

TERMINATION OF FEDERAL POWER COMMISSION;
TRANSFER OF FUNCTIONS

Federal Power Commission terminated and functions, personnel, property, funds, etc., transferred to Secretary of Energy (except for certain functions transferred to Federal Energy Regulatory Commission) by sections 7151(b), 7171(a), 7172(a)(1), 7291, and 7293 of Title 42, The Public Health and Welfare.

## § 717b. Exportation or importation of natural gas; LNG terminals

### (a) Mandatory authorization order

After six months from June 21, 1938, no person shall export any natural gas from the United States to a foreign country or import any natural gas from a foreign country without first having secured an order of the Commission authorizing it to do so. The Commission shall issue

#### (d) Jurisdiction of courts of United States

In case of contumacy by, or refusal to obey a subpena issued to, any person, the Commission may invoke the aid of any court of the United States within the jurisdiction of which such investigation or proceeding is carried on, or where such person resides or carries on business, in requiring the attendance and testimony of witnesses and the production of books, papers, correspondence, memoranda, contracts, agreements, and other records. Such court may issue an order requiring such person to appear before the Commission or member or officer designated by the Commission, there to produce records, if so ordered, or to give testimony touching the matter under investigation or in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof. All process in any such case may be served in the judicial district whereof such person is an inhabitant or wherever he may be found or may be doing business. Any person who willfully shall fail or refuse to attend and testify or to answer any lawful inquiry or to produce books, papers, correspondence, memoranda, contracts, agreements, or other records, if in his or its power so to do, in obedience to the subpena of the Commission, shall be guilty of a misdemeanor and upon conviction shall be subject to a fine of not more than $1,000 or to imprisonment for a term of not more than one year, or both.

#### (e) Testimony of witnesses

The testimony of any witness may be taken at the instance of a party, in any proceeding or investigation pending before the Commission, by deposition at any time after the proceeding is at issue. The Commission may also order testimony to be taken by deposition in any proceeding or investigation pending before it at any stage of such proceeding or investigation. Such depositions may be taken before any person authorized to administer oaths not being of counsel or attorney to either of the parties, nor interested in the proceeding or investigation. Reasonable notice must first be given in writing by the party or his attorney proposing to take such deposition to the opposite party or his attorney of record, as either may be nearest, which notice shall state the name of the witness and the time and place of the taking of his deposition. Any person may be compelled to appear and depose, and to produce documentary evidence, in the same manner as witnesses may be compelled to appear and testify and produce documentary evidence before the Commission, as hereinbefore provided. Such testimony shall be reduced to writing by the person taking deposition, or under his direction, and shall, after it has been reduced to writing, be subscribed by the deponent.

#### (f) Deposition of witnesses in a foreign country

If a witness whose testimony may be desired to be taken by deposition be in a foreign country, the deposition may be taken before an officer or person designated by the Commission, or agreed upon by the parties by stipulation in writing to be filed with the Commission. All depositions must be promptly filed with the Commission.

#### (g) Witness fees

Witnesses whose depositions are taken as authorized in this chapter, and the person or officer taking the same, shall be entitled to the same fees as are paid for like services in the courts of the United States.

(June 21, 1938, ch. 556, §14, 52 Stat. 828; Pub. L. 91–452, title II, §218, Oct. 15, 1970, 84 Stat. 929.)

AMENDMENTS

1970—Subsec. (h). Pub. L. 91–452 struck out subsec. (h) which related to the immunity from prosecution of any individual compelled to testify or produce evidence, documentary or otherwise, after claiming his privilege against self-incrimination.

EFFECTIVE DATE OF 1970 AMENDMENT

Amendment by Pub. L. 91–452 effective on sixtieth day following Oct. 15, 1970, and not to affect any immunity to which any individual is entitled under this section by reason of any testimony given before sixtieth day following Oct. 15, 1970, see section 260 of Pub. L. 91–452, set out as an Effective Date; Savings Provision note under section 6001 of Title 18, Crimes and Criminal Procedure.

STUDY AND REPORT ON NATURAL GAS PIPELINE AND STORAGE FACILITIES IN NEW ENGLAND

Pub. L. 107–355, §26, Dec. 17, 2002, 116 Stat. 3012, provided that:

"(a) STUDY.—The Federal Energy Regulatory Commission, in consultation with the Department of Energy, shall conduct a study on the natural gas pipeline transmission network in New England and natural gas storage facilities associated with that network.

"(b) CONSIDERATION.—In carrying out the study, the Commission shall consider the ability of natural gas pipeline and storage facilities in New England to meet current and projected demand by gas-fired power generation plants and other consumers.

"(c) REPORT.—Not later than 1 year after the date of enactment of this Act [Dec. 17, 2002], the Federal Energy Regulatory Commission shall prepare and submit to the Committee on Energy and Natural Resources of the Senate and the Committee on Energy and Commerce of the House of Representatives a report containing the results of the study conducted under subsection (a), including recommendations for addressing potential natural gas transmission and storage capacity problems in New England."

### §717n. Process coordination; hearings; rules of procedure

#### (a) Definition

In this section, the term "Federal authorization"—

(1) means any authorization required under Federal law with respect to an application for authorization under section 717b of this title or a certificate of public convenience and necessity under section 717f of this title; and

(2) includes any permits, special use authorizations, certifications, opinions, or other approvals as may be required under Federal law with respect to an application for authorization under section 717b of this title or a certificate of public convenience and necessity under section 717f of this title.

#### (b) Designation as lead agency

##### (1) In general

The Commission shall act as the lead agency for the purposes of coordinating all applicable Federal authorizations and for the purposes of

complying with the National Environmental Policy Act of 1969 (42 U.S.C. 4321 et seq.).

**(2) Other agencies**

Each Federal and State agency considering an aspect of an application for Federal authorization shall cooperate with the Commission and comply with the deadlines established by the Commission.

**(c) Schedule**

**(1) Commission authority to set schedule**

The Commission shall establish a schedule for all Federal authorizations. In establishing the schedule, the Commission shall—

(A) ensure expeditious completion of all such proceedings; and

(B) comply with applicable schedules established by Federal law.

**(2) Failure to meet schedule**

If a Federal or State administrative agency does not complete a proceeding for an approval that is required for a Federal authorization in accordance with the schedule established by the Commission, the applicant may pursue remedies under section 717r(d) of this title.

**(d) Consolidated record**

The Commission shall, with the cooperation of Federal and State administrative agencies and officials, maintain a complete consolidated record of all decisions made or actions taken by the Commission or by a Federal administrative agency or officer (or State administrative agency or officer acting under delegated Federal authority) with respect to any Federal authorization. Such record shall be the record for—

(1) appeals or reviews under the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), provided that the record may be supplemented as expressly provided pursuant to section 319 of that Act [16 U.S.C. 1465]; or

(2) judicial review under section 717r(d) of this title of decisions made or actions taken by Federal and State administrative agencies and officials, provided that, if the Court determines that the record does not contain sufficient information, the Court may remand the proceeding to the Commission for further development of the consolidated record.

**(e) Hearings; parties**

Hearings under this chapter may be held before the Commission, any member or members thereof, or any representative of the Commission designated by it, and appropriate records thereof shall be kept. In any proceeding before it, the Commission in accordance with such rules and regulations as it may prescribe, may admit as a party any interested State, State commission, municipality or any representative of interested consumers or security holders, or any competitor of a party to such proceeding, or any other person whose participation in the proceeding may be in the public interest.

**(f) Procedure**

All hearings, investigations, and proceedings under this chapter shall be governed by rules of practice and procedure to be adopted by the Commission, and in the conduct thereof the technical rules of evidence need not be applied. No informality in any hearing, investigation, or proceeding or in the manner of taking testimony shall invalidate any order, decision, rule, or regulation issued under the authority of this chapter.

(June 21, 1938, ch. 556, §15, 52 Stat. 829; Pub. L. 109–58, title III, §313(a), Aug. 8, 2005, 119 Stat. 688.)

REFERENCES IN TEXT

The National Environmental Policy Act of 1969, referred to in subsec. (b)(1), is Pub. L. 91–190, Jan. 1, 1970, 83 Stat. 852, as amended, which is classified generally to chapter 55 (§4321 et seq.) of Title 42, The Public Health and Welfare. For complete classification of this Act to the Code, see Short Title note set out under section 4321 of Title 42 and Tables.

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), is title III of Pub. L. 89–454, as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, as amended, which is classified generally to chapter 33 (§1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

AMENDMENTS

2005—Pub. L. 109–58 substituted "Process coordination; hearings; rules of procedure" for "Hearings; rules of procedure" in section catchline, added subsecs. (a) to (d), and redesignated former subsecs. (a) and (b) as (e) and (f), respectively.

## § 717o. Administrative powers of Commission; rules, regulations, and orders

The Commission shall have power to perform any and all acts, and to prescribe, issue, make, amend, and rescind such orders, rules, and regulations as it may find necessary or appropriate to carry out the provisions of this chapter. Among other things, such rules and regulations may define accounting, technical, and trade terms used in this chapter; and may prescribe the form or forms of all statements, declarations, applications, and reports to be filed with the Commission, the information which they shall contain, and the time within which they shall be filed. Unless a different date is specified therein, rules and regulations of the Commission shall be effective thirty days after publication in the manner which the Commission shall prescribe. Orders of the Commission shall be effective on the date and in the manner which the Commission shall prescribe. For the purposes of its rules and regulations, the Commission may classify persons and matters within its jurisdiction and prescribe different requirements for different classes of persons or matters. All rules and regulations of the Commission shall be filed with its secretary and shall be kept open in convenient form for public inspection and examination during reasonable business hours.

(June 21, 1938, ch. 556, §16, 52 Stat. 830.)

## § 717p. Joint boards

**(a) Reference of matters to joint boards; composition and power**

The Commission may refer any matter arising in the administration of this chapter to a board to be composed of a member or members, as determined by the Commission, from the State or

each of the States affected or to be affected by such matter. Any such board shall be vested with the same power and be subject to the same duties and liabilities as in the case of a member of the Commission when designated by the Commission to hold any hearings. The action of such board shall have such force and effect and its proceedings shall be conducted in such manner as the Commission shall by regulations prescribe. The Board shall be appointed by the Commission from persons nominated by the State commission of each State affected, or by the Governor of such State if there is no State commission. Each State affected shall be entitled to the same number of representatives on the board unless the nominating power of such State waives such right. The Commission shall have discretion to reject the nominee from any State, but shall thereupon invite a new nomination from that State. The members of a board shall receive such allowances for expenses as the Commission shall provide. The Commission may, when in its discretion sufficient reason exists therefor, revoke any reference to such a board.

**(b) Conference with State commissions regarding rate structure, costs, etc.**

The Commission may confer with any State commission regarding rate structures, costs, accounts, charges, practices, classifications, and regulations of natural-gas companies; and the Commission is authorized, under such rules and regulations as it shall prescribe, to hold joint hearings with any State commission in connection with any matter with respect to which the Commission is authorized to act. The Commission is authorized in the administration of this chapter to avail itself of such cooperation, services, records, and facilities as may be afforded by any State commission.

**(c) Information and reports available to State commissions**

The Commission shall make available to the several State commissions such information and reports as may be of assistance in State regulation of natural-gas companies. Whenever the Commission can do so without prejudice to the efficient and proper conduct of its affairs, it may, upon request from a State commission, make available to such State commission as witnesses any of its trained rate, valuation, or other experts, subject to reimbursement of the compensation and traveling expenses of such witnesses. All sums collected hereunder shall be credited to the appropriation from which the amounts were expended in carrying out the provisions of this subsection.

(June 21, 1938, ch. 556, §17, 52 Stat. 830.)

## §717q. Appointment of officers and employees

The Commission is authorized to appoint and fix the compensation of such officers, attorneys, examiners, and experts as may be necessary for carrying out its functions under this chapter; and the Commission may, subject to civil-service laws, appoint such other officers and employees as are necessary for carrying out such functions and fix their salaries in accordance with chapter 51 and subchapter III of chapter 53 of title 5.

(June 21, 1938, ch. 556, §18, 52 Stat. 831; Oct. 28, 1949, ch. 782, title XI, §1106(a), 63 Stat. 972.)

CODIFICATION

Provisions that authorized the Commission to appoint and fix the compensation of such officers, attorneys, examiners, and experts as may be necessary for carrying out its functions under this chapter "without regard to the provisions of other laws applicable to the employment and compensation of officers and employees of the United States" are omitted as obsolete and superseded.

As to the compensation of such personnel, sections 1202 and 1204 of the Classification Act of 1949, 63 Stat. 972, 973, repealed the Classification Act of 1923 and all other laws or parts of laws inconsistent with the 1949 Act. The Classification Act of 1949 was repealed by Pub. L. 89–554, Sept. 6, 1966, §8(a), 80 Stat. 632, and reenacted as chapter 51 and subchapter III of chapter 53 of Title 5, Government Organization and Employees. Section 5102 of Title 5 contains the applicability provisions of the 1949 Act, and section 5103 of Title 5 authorizes the Office of Personnel Management to determine the applicability to specific positions and employees.

Such appointments are now subject to the civil service laws unless specifically excepted by those laws or by laws enacted subsequent to Executive Order 8743, Apr. 23, 1941, issued by the President pursuant to the Act of Nov. 26, 1940, ch. 919, title I, §1, 54 Stat. 1211, which covered most excepted positions into the classified (competitive) civil service. The Order is set out as a note under section 3301 of Title 5.

"Chapter 51 and subchapter III of chapter 53 of title 5" substituted in text for "the Classification Act of 1949, as amended" on authority of Pub. L. 89–554, §7(b), Sept. 6, 1966, 80 Stat. 631, the first section of which enacted Title 5.

AMENDMENTS

1949—Act Oct. 28, 1949, substituted "Classification Act of 1949" for "Classification Act of 1923".

REPEALS

Act Oct. 28, 1949, ch. 782, cited as a credit to this section, was repealed (subject to a savings clause) by Pub. L. 89–554, Sept. 6, 1966, §8, 80 Stat. 632, 655.

## §717r. Rehearing and review

**(a) Application for rehearing; time**

Any person, State, municipality, or State commission aggrieved by an order issued by the Commission in a proceeding under this chapter to which such person, State, municipality, or State commission is a party may apply for a rehearing within thirty days after the issuance of such order. The application for rehearing shall set forth specifically the ground or grounds upon which such application is based. Upon such application the Commission shall have power to grant or deny rehearing or to abrogate or modify its order without further hearing. Unless the Commission acts upon the application for rehearing within thirty days after it is filed, such application may be deemed to have been denied. No proceeding to review any order of the Commission shall be brought by any person unless such person shall have made application to the Commission for a rehearing thereon. Until the record in a proceeding shall have been filed in a court of appeals, as provided in subsection (b) of this section, the Commission may at any time, upon reasonable notice and in such manner as it shall deem proper, modify or set aside, in whole or in part, any finding or order made or issued by it under the provisions of this chapter.

## (b) Review of Commission order

Any party to a proceeding under this chapter aggrieved by an order issued by the Commission in such proceeding may obtain a review of such order in the court of appeals of the United States for any circuit wherein the natural-gas company to which the order relates is located or has its principal place of business, or in the United States Court of Appeals for the District of Columbia, by filing in such court, within sixty days after the order of the Commission upon the application for rehearing, a written petition praying that the order of the Commission be modified or set aside in whole or in part. A copy of such petition shall forthwith be transmitted by the clerk of the court to any member of the Commission and thereupon the Commission shall file with the court the record upon which the order complained of was entered, as provided in section 2112 of title 28. Upon the filing of such petition such court shall have jurisdiction, which upon the filing of the record with it shall be exclusive, to affirm, modify, or set aside such order in whole or in part. No objection to the order of the Commission shall be considered by the court unless such objection shall have been urged before the Commission in the application for rehearing unless there is reasonable ground for failure so to do. The finding of the Commission as to the facts, if supported by substantial evidence, shall be conclusive. If any party shall apply to the court for leave to adduce additional evidence, and shall show to the satisfaction of the court that such additional evidence is material and that there were reasonable grounds for failure to adduce such evidence in the proceedings before the Commission, the court may order such additional evidence to be taken before the Commission and to be adduced upon the hearing in such manner and upon such terms and conditions as to the court may seem proper. The Commission may modify its findings as to the facts by reason of the additional evidence so taken, and it shall file with the court such modified or new findings, which is supported by substantial evidence, shall be conclusive, and its recommendation, if any, for the modification or setting aside of the original order. The judgment and decree of the court, affirming, modifying, or setting aside, in whole or in part, any such order of the Commission, shall be final, subject to review by the Supreme Court of the United States upon certiorari or certification as provided in section 1254 of title 28.

## (c) Stay of Commission order

The filing of an application for rehearing under subsection (a) of this section shall not, unless specifically ordered by the Commission, operate as a stay of the Commission's order. The commencement of proceedings under subsection (b) of this section shall not, unless specifically ordered by the court, operate as a stay of the Commission's order.

## (d) Judicial review

### (1) In general

The United States Court of Appeals for the circuit in which a facility subject to section 717b of this title or section 717f of this title is proposed to be constructed, expanded, or oper-

ated shall have original and exclusive jurisdiction over any civil action for the review of an order or action of a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit, license, concurrence, or approval (hereinafter collectively referred to as ''permit'') required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.).

### (2) Agency delay

The United States Court of Appeals for the District of Columbia shall have original and exclusive jurisdiction over any civil action for the review of an alleged failure to act by a Federal agency (other than the Commission) or State administrative agency acting pursuant to Federal law to issue, condition, or deny any permit required under Federal law, other than the Coastal Zone Management Act of 1972 (16 U.S.C. 1451 et seq.), for a facility subject to section 717b of this title or section 717f of this title. The failure of an agency to take action on a permit required under Federal law, other than the Coastal Zone Management Act of 1972, in accordance with the Commission schedule established pursuant to section 717n(c) of this title shall be considered inconsistent with Federal law for the purposes of paragraph (3).

### (3) Court action

If the Court finds that such order or action is inconsistent with the Federal law governing such permit and would prevent the construction, expansion, or operation of the facility subject to section 717b of this title or section 717f of this title, the Court shall remand the proceeding to the agency to take appropriate action consistent with the order of the Court. If the Court remands the order or action to the Federal or State agency, the Court shall set a reasonable schedule and deadline for the agency to act on remand.

### (4) Commission action

For any action described in this subsection, the Commission shall file with the Court the consolidated record of such order or action to which the appeal hereunder relates.

### (5) Expedited review

The Court shall set any action brought under this subsection for expedited consideration.

(June 21, 1938, ch. 556, §19, 52 Stat. 831; June 25, 1948, ch. 646, §32(a), 62 Stat. 991; May 24, 1949, ch. 139, §127, 63 Stat. 107; Pub. L. 85–791, §19, Aug. 28, 1958, 72 Stat. 947; Pub. L. 109–58, title III, §313(b), Aug. 8, 2005, 119 Stat. 689.)

REFERENCES IN TEXT

The Coastal Zone Management Act of 1972, referred to in subsec. (d)(1), (2), is title III of Pub. L. 89–454, as added by Pub. L. 92–583, Oct. 27, 1972, 86 Stat. 1280, as amended, which is classified generally to chapter 33 (§1451 et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see Short Title note set out under section 1451 of Title 16 and Tables.

CODIFICATION

In subsec. (b), ''section 1254 of title 28'' substituted for ''sections 239 and 240 of the Judicial Code, as amend-

ed [28 U.S.C. 346, 347]" on authority of act June 25, 1948, ch. 646, 62 Stat. 869, the first section of which enacted Title 28, Judiciary and Judicial Procedure.

### AMENDMENTS

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).

1958—Subsec. (a). Pub. L. 85–791, §19(a), inserted sentence providing that until record in a proceeding has been filed in a court of appeals, Commission may modify or set aside any finding or order issued by it.

Subsec. (b). Pub. L. 85–791, §19(b), in second sentence, substituted "transmitted by the clerk of the court to" for "served upon", substituted "file with the court" for "certify and file with the court a transcript of", and inserted "as provided in section 2112 of title 28", and, in third sentence, substituted "petition" for "transcript", and "jurisdiction, which upon the filing of the record with it shall be exclusive" for "exclusive jurisdiction".

### CHANGE OF NAME

Act June 25, 1948, eff. Sept. 1, 1948, as amended by act May 24, 1949, substituted "court of appeals" for "circuit court of appeals" wherever appearing.

## § 717s. Enforcement of chapter

### (a) Action in district court for injunction

Whenever it shall appear to the Commission that any person is engaged or about to engage in any acts or practices which constitute or will constitute a violation of the provisions of this chapter, or of any rule, regulation, or order thereunder, it may in its discretion bring an action in the proper district court of the United States, or the United States courts of any Territory or other place subject to the jurisdiction of the United States, to enjoin such acts or practices and to enforce compliance with this chapter or any rule, regulation, or order thereunder, and upon a proper showing a permanent or temporary injunction or decree or restraining order shall be granted without bond. The Commission may transmit such evidence as may be available concerning such acts or practices or concerning apparent violations of the Federal antitrust laws to the Attorney General, who, in his discretion, may institute the necessary criminal proceedings.

### (b) Mandamus

Upon application of the Commission the district courts of the United States and the United States courts of any Territory or other place subject to the jurisdiction of the United States shall have jurisdiction to issue writs of mandamus commanding any person to comply with the provisions of this chapter or any rule, regulation, or order of the Commission thereunder.

### (c) Employment of attorneys by Commission

The Commission may employ such attorneys as it finds necessary for proper legal aid and service of the Commission or its members in the conduct of their work, or for proper representation of the public interest in investigations made by it, or cases or proceedings pending before it, whether at the Commission's own instance or upon complaint, or to appear for or represent the Commission in any case in court; and the expenses of such employment shall be paid out of the appropriation for the Commission.

### (d) Violation of market manipulation provisions

In any proceedings under subsection (a) of this section, the court may prohibit, conditionally or unconditionally, and permanently or for such period of time as the court determines, any individual who is engaged or has engaged in practices constituting a violation of section 717c–1 of this title (including related rules and regulations) from—

(1) acting as an officer or director of a natural gas company; or

(2) engaging in the business of—

(A) the purchasing or selling of natural gas; or

(B) the purchasing or selling of transmission services subject to the jurisdiction of the Commission.

(June 21, 1938, ch. 556, §20, 52 Stat. 832; June 25, 1948, ch. 646, §1, 62 Stat. 875, 895; Pub. L. 109–58, title III, §318, Aug. 8, 2005, 119 Stat. 693.)

### CODIFICATION

The words "the District Court of the United States for the District of Columbia" in subsec. (a) following "district court of the United States" and in subsec. (b) following "district courts of the United States" omitted as superfluous in view of section 132(a) of Title 28, Judiciary and Judicial Procedure, which states that "There shall be in each judicial district a district court which shall be a court of record known as the United States District Court for the district", and section 88 of title 28 which states that "The District of Columbia constitutes one judicial district".

### AMENDMENTS

2005—Subsec. (d). Pub. L. 109–58 added subsec. (d).

## § 717t. General penalties

(a) Any person who willfully and knowingly does or causes or suffers to be done any act, matter, or thing in this chapter prohibited or declared to be unlawful, or who willfully and knowingly omits or fails to do any act, matter, or thing in this chapter required to be done, or willfully and knowingly causes or suffers such omission or failure, shall, upon conviction thereof, be punished by a fine of not more than $1,000,000 or by imprisonment for not more than 5 years, or both.

(b) Any person who willfully and knowingly violates any rule, regulation, restriction, condition, or order made or imposed by the Commission under authority of this chapter, shall, in addition to any other penalties provided by law, be punished upon conviction thereof by a fine of not exceeding $50,000 for each and every day during which such offense occurs.

(June 21, 1938, ch. 556, §21, 52 Stat. 833; Pub. L. 109–58, title III, §314(a)(1), Aug. 8, 2005, 119 Stat. 690.)

### AMENDMENTS

2005—Subsec. (a). Pub. L. 109–58, §314(a)(1)(A), substituted "$1,000,000" for "$5,000" and "5 years" for "two years".

Subsec. (b). Pub. L. 109–58, §314(a)(1)(B), substituted "$50,000" for "$500".

## § 717t-1. Civil penalty authority

### (a) In general

Any person that violates this chapter, or any rule, regulation, restriction, condition, or order made or imposed by the Commission under authority of this chapter, shall be subject to a

(2) The Secretary shall select the Director of the Office from among individuals who have substantial expertise in matters relating to foreign intelligence.

### (c) Duties

Subject to the authority, direction, and control of the Secretary, the Director of the Office shall perform such duties and exercise such powers as the Secretary may prescribe.

(Pub. L. 95–91, title II, §216, as added Pub. L. 106–65, div. C, title XXXII, §3204(a), Oct. 5, 1999, 113 Stat. 956; amended Pub. L. 109–364, div. C, title XXXI, §3117(f), Oct. 17, 2006, 120 Stat. 2508.)

AMENDMENTS

2006—Subsec. (b)(1). Pub. L. 109–364 substituted "who shall be an employee in the Senior Executive Service, the Senior Intelligence Service, the Senior National Intelligence Service, or any other Service that the Secretary, in coordination with the Director of National Intelligence, considers appropriate" for "which shall be a position in the Senior Executive Service".

EFFECTIVE DATE

Section effective Oct. 5, 1999, see section 3299 of Pub. L. 106–65, set out as a note under section 2401 of Title 50, War and National Defense.

## § 7144d. Office of Arctic Energy

### (a) Establishment

The Secretary of Energy may establish within the Department of Energy an Office of Arctic Energy.

### (b) Purposes

The purposes of such office shall be as follows:
(1) To promote research, development, and deployment of electric power technology that is cost-effective and especially well suited to meet the needs of rural and remote regions of the United States, especially where permafrost is present or located nearby.
(2) To promote research, development, and deployment in such regions of—
  (A) enhanced oil recovery technology, including heavy oil recovery, reinjection of carbon, and extended reach drilling technologies;
  (B) gas-to-liquids technology and liquified natural gas (including associated transportation systems);
  (C) small hydroelectric facilities, river turbines, and tidal power;
  (D) natural gas hydrates, coal bed methane, and shallow bed natural gas; and
  (E) alternative energy, including wind, geothermal, and fuel cells.

### (c) Location

The Secretary shall locate such office at a university with expertise and experience in the matters specified in subsection (b) of this section.

(Pub. L. 106–398, §1 [div. C, title XXXI, §3197], Oct. 30, 2000, 114 Stat. 1654, 1654A–482.)

CODIFICATION

Section was enacted as part of the Floyd D. Spence National Defense Authorization Act for Fiscal Year 2001, and not as part of the Department of Energy Organization Act which comprises this chapter.

## § 7144e. Office of Indian Energy Policy and Programs

### (a) Establishment

There is established within the Department an Office of Indian Energy Policy and Programs (referred to in this section as the "Office"). The Office shall be headed by a Director, who shall be appointed by the Secretary and compensated at a rate equal to that of level IV of the Executive Schedule under section 5315 of title 5.

### (b) Duties of Director

The Director, in accordance with Federal policies promoting Indian self-determination and the purposes of this chapter, shall provide, direct, foster, coordinate, and implement energy planning, education, management, conservation, and delivery programs of the Department that—
(1) promote Indian tribal energy development, efficiency, and use;
(2) reduce or stabilize energy costs;
(3) enhance and strengthen Indian tribal energy and economic infrastructure relating to natural resource development and electrification; and
(4) bring electrical power and service to Indian land and the homes of tribal members located on Indian lands or acquired, constructed, or improved (in whole or in part) with Federal funds.

(Pub. L. 95–91, title II, §217, as added Pub. L. 109–58, title V, §502(a), Aug. 8, 2005, 119 Stat. 763.)

REFERENCES IN TEXT

This chapter, referred to in subsec. (b), was in the original "this Act", meaning Pub. L. 95–91, Aug. 4, 1977, 91 Stat. 565, as amended, known as the Department of Energy Organization Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 7101 of this title and Tables.

## SUBCHAPTER III—TRANSFERS OF FUNCTIONS

## § 7151. General transfers

(a) Except as otherwise provided in this chapter, there are transferred to, and vested in, the Secretary all of the functions vested by law in the Administrator of the Federal Energy Administration or the Federal Energy Administration, the Administrator of the Energy Research and Development Administration or the Energy Research and Development Administration; and the functions vested by law in the officers and components of either such Administration.

(b) Except as provided in subchapter IV of this chapter, there are transferred to, and vested in, the Secretary the function of the Federal Power Commission, or of the members, officers, or components thereof. The Secretary may exercise any power described in section 7172(a)(2) of this title to the extent the Secretary determines such power to be necessary to the exercise of any function within his jurisdiction pursuant to the preceding sentence.

(Pub. L. 95–91, title III, §301, Aug. 4, 1977, 91 Stat. 577.)

REFERENCES IN TEXT

This chapter, referred to in subsec. (a), was in the original "this Act", meaning Pub. L. 95–91, Aug. 4, 1977,

Addendum 8

91 Stat. 565, as amended, known as the Department of Energy Organization Act, which is classified principally to this chapter. For complete classification of this Act to the Code, see Short Title note set out under section 7101 of this title and Tables.

EMERGENCY PREPAREDNESS FUNCTIONS

For assignment of certain emergency preparedness functions to the Secretary of Energy, see Parts 1, 2, and 7 of Ex. Ord. No. 12656, Nov. 18, 1988, 53 F.R. 47491, set out as a note under section 5195 of this title.

EX. ORD. NO. 12038. TRANSFER OF CERTAIN FUNCTIONS TO SECRETARY OF ENERGY

Ex. Ord. No. 12038, Feb. 3, 1978, 43 F.R. 4957, as amended by Ex. Ord. No. 12156, Sept. 10, 1979, 44 F.R. 53073, provided:

By virtue of the authority vested in me as President of the United States of America, in order to reflect the responsibilities of the Secretary of Energy for the performance of certain functions previously vested in other officers of the United States by direction of the President and subsequently transferred to the Secretary of Energy pursuant to the Department of Energy Organization Act (91 Stat. 565; 42 U.S.C. 7101 et seq.) it is hereby ordered as follows:

SECTION 1. *Functions of the Federal Energy Administration.* In accordance with the transfer of all functions vested by law in the Federal Energy Administration, or the Administrator thereof, to the Secretary of Energy pursuant to Section 301(a) of the Department of Energy Organization Act [subsec. (a) of this section], hereinafter referred to as the Act, the Executive Orders and Proclamations referred to in this Section, which conferred authority or responsibility upon the Administrator of the Federal Energy Administration, are amended as follows:

(a) Executive Order No. 11647, as amended [formerly set out as a note under 31 U.S.C. 501], relating to Federal Regional Councils, is further amended by deleting "The Federal Energy Administration" in Section 1(a)(10) and substituting "The Department of Energy", and by deleting "The Deputy Administrator of the Federal Energy Administration" in Section 3(a)(10) and substituting "The Deputy Secretary of Energy".

(b) Executive Order No. 11790 of June 25, 1974 [set out as a note under 15 U.S.C. 761], relating to the Federal Energy Administration Act of 1974, is amended by deleting "Administrator of the Federal Energy Administration" and "Administrator" wherever they appear in Sections 1 through 6 and substituting "Secretary of Energy" and "Secretary", respectively, and by deleting Section 7 through 10.

(c) Executive Order No. 11912, as amended [set out as a note under 42 U.S.C. 6201], relating to energy policy and conservation, and Proclamation No. 3279, as amended [set out as a note under 19 U.S.C. 1862], relating to imports of petroleum and petroleum products, are further amended by deleting "Administrator of the Federal Energy Administration", "Federal Energy Administration", and "Administrator" (when used in reference to the Federal Energy Administration) wherever those terms appear and by substituting "Secretary of Energy", "Department of Energy", and "Secretary", respectively, and by deleting "the Administrator of Energy Research and Development" in Section 10(a)(1) of Executive Order No. 11912, as amended.

SEC. 2. *Functions of the Federal Power Commission.* In accordance with the transfer of functions vested in the Federal Power Commission to the Secretary of Energy pursuant to Section 301(b) of the Act [subsec. (b) of this section], the Executive Orders referred to in this Section, which conferred authority or responsibility upon the Federal Power Commission, or Chairman thereof, are amended or modified as follows:

(a) Executive Order No. 10485 of September 3, 1953, [set out as a note under 15 U.S.C. 717b], relating to certain facilities at the borders of the United States is amended by deleting Section 2 thereof, and by deleting

"Federal Power Commission" and "Commission" wherever those terms appear in Sections 1, 3 and 4 of such Order and substituting for each "Secretary of Energy".

(b) Executive Order No. 11969 of February 2, 1977 [formerly set out as a note under 15 U.S.C. 717], relating to the administration of the Emergency Natural Gas Act of 1977 [formerly set out as a note under 15 U.S.C. 717], is hereby amended by deleting the second sentence in Section 1, by deleting "the Secretary of the Interior, the Administrator of the Federal Energy Administration, other members of the Federal Power Commission and in Section 2, and by deleting "Chairman of the Federal Power Commission" and "Chairman" wherever those terms appear and substituting therefor "Secretary of Energy" and "Secretary", respectively.

(c) Paragraph (2) of Section 3 of Executive Order No. 11331, as amended [formerly set out as a note under 42 U.S.C. 1962b], relating to the Pacific Northwest River Basins Commission, is hereby amended by deleting "from each of the following Federal departments and agencies" and substituting therefor "to be appointed by the head of each of the following Executive agencies", by deleting "Federal Power Commission" and substituting therefor "Department of Energy", and by deleting "such member to be appointed by the head of each department or independent agency he represents,".

SEC. 3. *Functions of the Secretary of the Interior.* In accordance with the transfer of certain functions vested in the Secretary of the Interior to the Secretary of Energy pursuant to Section 302 of the Act [42 U.S.C. 7152], the Executive Orders referred to in this Section, which conferred authority or responsibility on the Secretary of the Interior, are amended or modified as follows:

(a) Sections 1 and 4 of Executive Order No. 8526 of August 27, 1940, relating to functions of the Bonneville Power Administration, are hereby amended by substituting "Secretary of Energy" for "Secretary of the Interior", by adding "of the Interior" after "Secretary" in Sections 2 and 3, and by adding "and the Secretary of Energy," after "the Secretary of the Interior" wherever the latter term appears in Section 5.

(b) Executive Order No. 11177 of September 16, 1964, relating to the Columbia River Treaty, is amended by deleting "Secretary of the Interior" and "Department of the Interior" wherever those terms appear and substituting therefor "Secretary of Energy" and "Department of Energy", respectively.

SEC. 4. *Functions of the Atomic Energy Commission and the Energy Research and Development Administration.*

(a) In accordance with the transfer of all functions vested by law in the Administrator of Energy Research and Development to the Secretary of Energy pursuant to Section 301(a) of the Act [subsec. (a) of this section] the Executive Orders referred to in this Section are amended or modified as follows:

(1) All current Executive Orders which refer to functions of the Atomic Energy Commission, including Executive Order No. 10127, as amended; Executive Order No. 10865, as amended [set out as a note under 50 U.S.C. 435]; Executive Order No. 10899 of December 9, 1960 [set out as a note under 42 U.S.C. 2162]; Executive Order No. 11057 of December 18, 1962 [set out as a note under 42 U.S.C. 2162]; Executive Order No. 11477 of August 7, 1969 [set out as a note under 42 U.S.C. 2187]; Executive Order No. 11752 of December 17, 1973 [formerly set out as a note under 42 U.S.C. 4331]; and Executive Order No. 11761 of January 17, 1974 [formerly set out as a note under 20 U.S.C. 1221]; are modified to provide that all such functions shall be exercised by (1) the Secretary of Energy to the extent consistent with the functions of the Atomic Energy Commission that were transferred to the Administrator of Energy Research and Development pursuant to the Energy Organization Act of 1974 (Public Law 93–438; 88 Stat. 1233) [42 U.S.C. 5801 et seq.], and (2) the Nuclear Regulatory Commission to the extent consistent with the functions of the Atomic Energy Commission that were transferred to the Commission by the Energy Reorganization Act of 1974 [42 U.S.C. 5801 et seq.].

(2) Executive Order No. 11652, as amended [formerly set out as a note under 50 U.S.C. 435], relating to the classification of national security matters, is further amended by substituting "Department of Energy" for "Energy Research and Development Administration" in Sections 2(A), 7(A) and 8 and by deleting "Federal Power Commission" in Section 2(B)(3).

(3) Executive Order No. 11902 of February 2, 1976 [formerly set out as a note under 42 U.S.C. 5841], relating to export licensing policy for nuclear materials and equipment, is amended by substituting "the Secretary of Energy" for "the Administrator of the United States Energy Research and Development Administration, hereinafter referred to as the Administrator" in Section 1(b) and for the "Administrator" in Sections 2 and 3.

(4) Executive Order No. 11905, as amended, [formerly set out as a note under 50 U.S.C. 401], relating to foreign intelligence activities, is further amended by deleting "Energy Research and Development Administration", "Administrator or the Energy Research and Development Administration", and "ERDA" wherever those terms appear and substituting "Department of Energy", "Secretary of Energy", and "DOE" respectively.

(5) Section 3(2) of each of the following Executive Orders is amended by substituting "Department of Energy" for "Energy Research and Development Administration":

(i) Executive Order No. 11345, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Great Lakes River Basin Commission.

(ii) Executive Order No. 11371, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the New England River Basin Commission.

(iii) Executive Order No. 11578, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Ohio River Basin Commission.

(iv) Executive Order No. 11658, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Missouri River Basin Commission.

(v) Executive Order No. 11659, as amended [formerly set out as a note under 42 U.S.C. 1962b], establishing the Mississippi River Basin Commission.

SEC. 5. *Special Provisions Relating to Emergency Preparedness and Mobilization Functions.*

(a) Executive Order No. 10480, as amended [formerly set out as a note under 50 U.S.C. App. 2153], is further amended by adding thereto the following new Sections:

"Sec. 609. Effective October 1, 1977, the Secretary of Energy shall exercise all authority and discharge all responsibility herein delegated to or conferred upon (a) the Atomic Energy Commission, and (b) with respect to petroleum, gas, solid fuels and electric power, upon the Secretary of the Interior.

"Sec. 610. Whenever the Administrator of General Services believes that the functions of an Executive agency have been modified pursuant to law in such manner as to require the amendment of any Executive order which relates to the assignment of emergency preparedness functions or the administration of mobilization programs, he shall promptly submit any proposals for the amendment of such Executive orders to the Director of the Office of Management and Budget in accordance with the provisions of Executive Order No. 11030, as amended [set out as a note under 44 U.S.C. 1505].

(b) Executive Order No. 11490, as amended [formerly set out as a note under 50 U.S.C. App. 2251], is further amended by adding thereto the following new section:

"Sec. 3016. Effective October 1, 1977, the Secretary of Energy shall exercise all authority and discharge all responsibility herein delegated to or conferred upon (a) the Federal Power Commission, (b) the Energy Research and Development Administration, and (c) with respect to electric power, petroleum, gas and solid fuels, upon the Department of the Interior.".

SEC. 6. This Order shall be effective as of October 1, 1977, the effective date of the Department of Energy Organization Act [this chapter] pursuant to the provisions of section 901 [42 U.S.C. 7341] thereof and Executive Order No. 12009 of September 13, 1977 [formerly set out as a note under 42 U.S.C. 7341], and all actions taken by the Secretary of Energy on or after October 1, 1977, which are consistent with the foregoing provisions are entitled to full force and effect.

JIMMY CARTER.

## §7151a. Jurisdiction over matters transferred from Energy Research and Development Administration

Notwithstanding any other provision of law, jurisdiction over matters transferred to the Department of Energy from the Energy Research and Development Administration which on the effective date of such transfer were required by law, regulation, or administrative order to be made on the record after an opportunity for an agency hearing may be assigned to the Federal Energy Regulatory Commission or retained by the Secretary at his discretion.

(Pub. L. 95–238, title I, §104(a), Feb. 25, 1978, 92 Stat. 53.)

CODIFICATION

Section was enacted as part of the Department of Energy Act of 1978—Civilian Applications, and not as part of the Department of Energy Organization Act which comprises this chapter.

## §7152. Transfers from Department of the Interior

### (a) Functions relating to electric power

(1) There are transferred to, and vested in, the Secretary all functions of the Secretary of the Interior under section 825s of title 16, and all other functions of the Secretary of the Interior, and officers and components of the Department of the Interior, with respect to—

(A) the Southeastern Power Administration;

(B) the Southwestern Power Administration;

(C) the Bonneville Power Administration including but not limited to the authority contained in the Bonneville Project Act of 1937 [16 U.S.C. 832 et seq.] and the Federal Columbia River Transmission System Act [16 U.S.C. 838 et seq.];

(D) the power marketing functions of the Bureau of Reclamation, including the construction, operation, and maintenance of transmission lines and attendant facilities; and

(E) the transmission and disposition of the electric power and energy generated at Falcon Dam and Amistad Dam, international storage reservoir projects on the Rio Grande, pursuant to the Act of June 18, 1954, as amended by the Act of December 23, 1963.

(2) The Southeastern Power Administration, the Southwestern Power Administration, and the Bonneville Power Administration,[1] shall be preserved as separate and distinct organizational entities within the Department. Each such entity shall be headed by an Administrator appointed by the Secretary. The functions transferred to the Secretary in paragraphs (1)(A), (1)(B), (1)(C), and (1)(D) shall be exercised by the Secretary, acting by and through such Administrators. Each such Administrator shall

---

[1] So in original. The comma probably should not appear.

## § 7172. Jurisdiction of Commission

### (a) Transfer of functions from Federal Power Commission

(1) There are transferred to, and vested in, the Commission the following functions of the Federal Power Commission or of any member of the Commission or any officer or component of the Commission:

(A) the investigation, issuance, transfer, renewal, revocation, and enforcement of licenses and permits for the construction, operation, and maintenance of dams, water conduits, reservoirs, powerhouses, transmission lines, or other works for the development and improvement of navigation and for the development and utilization of power across, along, from, or in navigable waters under part I of the Federal Power Act [16 U.S.C. 791a et seq.];

(B) the establishment, review, and enforcement of rates and charges for the transmission or sale of electric energy, including determinations on construction work in progress, under part II of the Federal Power Act [16 U.S.C. 824 et seq.], and the interconnection, under section 202(b), of such Act [16 U.S.C. 824a(b)], of facilities for the generation, transmission, and sale of electric energy (other than emergency interconnection);

(C) the establishment, review, and enforcement of rates and charges for the transportation and sale of natural gas by a producer or gatherer or by a natural gas pipeline or natural gas company under sections 1, 4, 5, and 6 of the Natural Gas Act [15 U.S.C. 717, 717c to 717e];

(D) the issuance of a certificate of public convenience and necessity, including abandonment of facilities or services, and the establishment of physical connections under section 7 of the Natural Gas Act [15 U.S.C. 717f];

(E) the establishment, review, and enforcement of curtailments, other than the establishment and review of priorities for such curtailments, under the Natural Gas Act [15 U.S.C. 717 et seq.]; and

(F) the regulation of mergers and securities acquisition under the Federal Power Act [16 U.S.C. 791a et seq.] and Natural Gas Act [15 U.S.C. 717 et seq.].

(2) The Commission may exercise any power under the following sections to the extent the Commission determines such power to be necessary to the exercise of any function within the jurisdiction of the Commission:

(A) sections 4, 301, 302, 306 through 309, and 312 through 316 of the Federal Power Act [16 U.S.C. 797, 825, 825a, 825e to 825h, 825k to 825o]; and

(B) sections 8, 9, 13 through 17, 20, and 21 of the Natural Gas Act [15 U.S.C. 717g, 717h, 717l to 717p, 717s, 717t].

### (b) Repealed. Pub. L. 103–272, § 7(b), July 5, 1994, 108 Stat. 1379

### (c) Consideration of proposals made by Secretary to amend regulations issued under section 753 of title 15; exception

(1) Pursuant to the procedures specified in section 7174 of this title and except as provided in paragraph (2), the Commission shall have jurisdiction to consider any proposal by the Secretary to amend the regulation required to be issued under section 753(a)[1] of title 15 which is required by section 757 or 760a[1] of title 15 to be transmitted by the President to, and reviewed by, each House of Congress, under section 6421 of this title.

(2) In the event that the President determines that an emergency situation of overriding national importance exists and requires the expeditious promulgation of a rule described in paragraph (1), the President may direct the Secretary to assume sole jurisdiction over the promulgation of such rule, and such rule shall be transmitted by the President to, and reviewed by, each House of Congress under section 757 or 760a[1] of title 15, and section 6421 of this title.

### (d) Matters involving agency determinations to be made on record after agency hearing

The Commission shall have jurisdiction to hear and determine any other matter arising under any other function of the Secretary—

(1) involving any agency determination required by law to be made on the record after an opportunity for an agency hearing; or

(2) involving any other agency determination which the Secretary determines shall be made on the record after an opportunity for an agency hearing,

except that nothing in this subsection shall require that functions under sections 6213 and 6214[1] of this title shall be within the jurisdiction of the Commission unless the Secretary assigns such a function to the Commission.

### (e) Matters assigned by Secretary after public notice and matters referred under section 7174 of this title

In addition to the other provisions of this section, the Commission shall have jurisdiction over any other matter which the Secretary may assign to the Commission after public notice, or which are required to be referred to the Commission pursuant to section 7174 of this title.

### (f) Limitation

No function described in this section which regulates the exports or imports of natural gas or electricity shall be within the jurisdiction of the Commission unless the Secretary assigns such a function to the Commission.

### (g) Final agency action

The decision of the Commission involving any function within its jurisdiction, other than action by it on a matter referred to it pursuant to section 7174 of this title, shall be final agency action within the meaning of section 704 of title 5 and shall not be subject to further review by the Secretary or any officer or employee of the Department.

### (h) Rules, regulations, and statements of policy

The Commission is authorized to prescribe rules, regulations, and statements of policy of general applicability with respect to any function under the jurisdiction of the Commission pursuant to this section.

---

[1] See References in Text note below.

(Pub. L. 95–91, title IV, § 402, Aug. 4, 1977, 91 Stat. 583; Pub. L. 103–272, § 7(b), July 5, 1994, 108 Stat. 1379.)

REFERENCES IN TEXT

The Federal Power Act, referred to in subsec. (a)(1)(A), (B), and (F), is act June 10, 1920, ch. 285, 41 Stat. 1063, as amended, which is classified generally to chapter 12 (§791a et seq.) of Title 16, Conservation. Parts I and II of the Federal Power Act are classified generally to subchapters I (§791a et seq.) and II (§824 et seq.), respectively, of chapter 12 of Title 16. For complete classification of this Act to the Code, see section 791a of Title 16 and Tables.

The Natural Gas Act, referred to in subsec. (a)(1)(E), (F), is act June 21, 1938, ch. 556, 52 Stat. 821, as amended, which is classified generally to chapter 15B (§717 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 717w of Title 15 and Tables.

Sections 753, 757, and 760a of title 15, referred to in subsec. (c), were omitted from the Code pursuant to section 760g of Title 15, which provided for the expiration of the President's authority under those sections on Sept. 30, 1981.

Section 6214 of this title, referred to in subsec. (d), was repealed by Pub. L. 106–469, title I, § 103(3), Nov. 9, 2000, 114 Stat. 2029.

AMENDMENTS

1994—Subsec. (b). Pub. L. 103–272 struck out subsec. (b) which read as follows: "There are transferred to, and vested in, the Commission all functions and authority of the Interstate Commerce Commission or any officer or component of such Commission where the regulatory function establishes rates or charges for the transportation of oil by pipeline or establishes the valuation of any such pipeline." See section 60502 of Title 49, Transportation.

OIL PIPELINE REGULATORY REFORM

Pub. L. 102–486, title XVIII, Oct. 24, 1992, 106 Stat. 3010, provided that:

"SEC. 1801. OIL PIPELINE RATEMAKING METHODOLOGY.

"(a) ESTABLISHMENT.—Not later than 1 year after the date of the enactment of this Act [Oct. 24, 1992], the Federal Energy Regulatory Commission shall issue a final rule which establishes a simplified and generally applicable ratemaking methodology for oil pipelines in accordance with section 1(5) of part I of the Interstate Commerce Act [former 49 U.S.C. 1(5)].

"(b) EFFECTIVE DATE.—The final rule to be issued under subsection (a) may not take effect before the 365th day following the date of the issuance of the rule.

"SEC. 1802. STREAMLINING OF COMMISSION PROCEDURES.

"(a) RULEMAKING.—Not later than 18 months after the date of the enactment of this Act [Oct. 24, 1992], the Commission shall issue a final rule to streamline procedures of the Commission relating to oil pipeline rates in order to avoid unnecessary regulatory costs and delays.

"(b) SCOPE OF RULEMAKING.—Issues to be considered in the rulemaking proceeding to be conducted under subsection (a) shall include the following:

"(1) Identification of information to be filed with an oil pipeline tariff and the availability to the public of any analysis of such tariff filing performed by the Commission or its staff.

"(2) Qualification for standing (including definitions of economic interest) of parties who protest oil pipeline tariff filings or file complaints thereto.

"(3) The level of specificity required for a protest or complaint and guidelines for Commission action on the portion of the tariff or rate filing subject to protest or complaint.

"(4) An opportunity for the oil pipeline to file a response for the record to an initial protest or complaint.

"(5) Identification of specific circumstances under which Commission staff may initiate a protest.

"(c) ADDITIONAL PROCEDURAL CHANGES.—In conducting the rulemaking proceeding to carry out subsection (a), the Commission shall identify and transmit to Congress any other procedural changes relating to oil pipeline rates which the Commission determines are necessary to avoid unnecessary regulatory costs and delays and for which additional legislative authority may be necessary.

"(d) WITHDRAWAL OF TARIFFS AND COMPLAINTS.—

"(1) WITHDRAWAL OF TARIFFS.—If an oil pipeline tariff which is filed under part I of the Interstate Commerce Act [former 49 U.S.C. 1 et seq.] and which is subject to investigation is withdrawn—

"(A) any proceeding with respect to such tariff shall be terminated;

"(B) the previous tariff rate shall be reinstated; and

"(C) any amounts collected under the withdrawn tariff rate which are in excess of the previous tariff rate shall be refunded.

"(2) WITHDRAWAL OF COMPLAINTS.—If a complaint which is filed under section 13 of the Interstate Commerce Act [former 49 U.S.C. 13] with respect to an oil pipeline tariff is withdrawn, any proceeding with respect to such complaint shall be terminated.

"(e) ALTERNATIVE DISPUTE RESOLUTION.—To the maximum extent practicable, the Commission shall establish appropriate alternative dispute resolution procedures, including required negotiations and voluntary arbitration, early in an oil pipeline rate proceeding as a method preferable to adjudication in resolving disputes relating to the rate. Any proposed rates derived from implementation of such procedures shall be considered by the Commission on an expedited basis for approval.

"SEC. 1803. PROTECTION OF CERTAIN EXISTING RATES.

"(a) RATES DEEMED JUST AND REASONABLE.—Except as provided in subsection (b)—

"(1) any rate in effect for the 365-day period ending on the date of the enactment of this Act [Oct. 24, 1992] shall be deemed to be just and reasonable (within the meaning of section 1(5) of the Interstate Commerce Act [former 49 U.S.C. 1(5)]); and

"(2) any rate in effect on the 365th day preceding the date of such enactment shall be deemed to be just and reasonable (within the meaning of such section 1(5)) regardless of whether or not, with respect to such rate, a new rate has been filed with the Commission during such 365-day period;

if the rate in effect, as described in paragraph (1) or (2), has not been subject to protest, investigation, or complaint during such 365-day period.

"(b) CHANGED CIRCUMSTANCES.—No person may file a complaint under section 13 of the Interstate Commerce Act [former 49 U.S.C. 13] against a rate deemed to be just and reasonable under subsection (a) unless—

"(1) evidence is presented to the Commission which establishes that a substantial change has occurred after the date of the enactment of this Act [Oct. 24, 1992]—

"(A) in the economic circumstances of the oil pipeline which were a basis for the rate; or

"(B) in the nature of the services provided which were a basis for the rate; or

"(2) the person filing the complaint was under a contractual prohibition against the filing of a complaint which was in effect on the date of enactment of this Act and had been in effect prior to January 1, 1991, provided that a complaint by a party bound by such prohibition is brought within 30 days after the expiration of such prohibition.

If the Commission determines pursuant to a proceeding instituted as a result of a complaint under section 13 of

the Interstate Commerce Act that the rate is not just and reasonable, the rate shall not be deemed to be just and reasonable. Any tariff reduction or refunds that may result as an outcome of such a complaint shall be prospective from the date of the filing of the complaint.

"(c) LIMITATION REGARDING UNDULY DISCRIMINATORY OR PREFERENTIAL TARIFFS.—Nothing in this section shall prohibit any aggrieved person from filing a complaint under section 13 or section 15(1) of the Interstate Commerce Act [former 49 U.S.C. 13, 15(1)] challenging any tariff provision as unduly discriminatory or unduly preferential.

"SEC. 1804. DEFINITIONS.

"For the purposes of this title, the following definitions apply:

"(1) COMMISSION.—The term 'Commission' means the Federal Energy Regulatory Commission and, unless the context requires otherwise, includes the Oil Pipeline Board and any other office or component of the Commission to which the functions and authority vested in the Commission under section 402(b) of the Department of Energy Organization Act (42 U.S.C. 7172(b)) are delegated.

"(2) OIL PIPELINE.—

"(A) IN GENERAL.—Except as provided in subparagraph (B), the term 'oil pipeline' means any common carrier (within the meaning of the Interstate Commerce Act [former 49 U.S.C. 1 et seq.]) which transports oil by pipeline subject to the functions and authority vested in the Commission under section 402(b) of the Department of Energy Organization Act (42 U.S.C. 7172(b)).

"(B) EXCEPTION.—The term 'oil pipeline' does not include the Trans-Alaska Pipeline authorized by the Trans-Alaska Pipeline Authorization Act (43 U.S.C. 1651 et seq.) or any pipeline delivering oil directly or indirectly to the Trans-Alaska Pipeline.

"(3) OIL.—The term 'oil' has the same meaning as is given such term for purposes of the transfer of functions from the Interstate Commerce Commission to the Federal Energy Regulatory Commission under section 402(b) of the Department of Energy Organization Act (42 U.S.C. 7172(b)).

"(4) RATE.—The term 'rate' means all charges that an oil pipeline requires shippers to pay for transportation services."

### § 7173. Initiation of rulemaking procedures before Commission

#### (a) Proposal of rules, regulations, and statements of policy of general applicability by Secretary and Commission

The Secretary and the Commission are authorized to propose rules, regulations, and statements of policy of general applicability with respect to any function within the jurisdiction of the Commission under section 7172 of this title.

#### (b) Consideration and final action on proposals of Secretary

The Commission shall have exclusive jurisdiction with respect to any proposal made under subsection (a) of this section, and shall consider and take final action on any proposal made by the Secretary under such subsection in an expeditious manner in accordance with such reasonable time limits as may be set by the Secretary for the completion of action by the Commission on any such proposal.

#### (c) Utilization of rulemaking procedures for establishment of rates and charges under Federal Power Act and Natural Gas Act

Any function described in section 7172 of this title which relates to the establishment of rates and charges under the Federal Power Act [16 U.S.C. 791a et seq.] or the Natural Gas Act [15 U.S.C. 717 et seq.], may be conducted by rulemaking procedures. Except as provided in subsection (d) of this section, the procedures in such a rulemaking proceeding shall assure full consideration of the issues and an opportunity for interested persons to present their views.

#### (d) Submission of written questions by interested persons

With respect to any rule or regulation promulgated by the Commission to establish rates and charges for the first sale of natural gas by a producer or gatherer to a natural gas pipeline under the Natural Gas Act [15 U.S.C. 717 et seq.], the Commission may afford any interested person a reasonable opportunity to submit written questions with respect to disputed issues of fact to other interested persons participating in the rulemaking proceedings. The Commission may establish a reasonable time for both the submission of questions and responses thereto.

(Pub. L. 95–91, title IV, § 403, Aug. 4, 1977, 91 Stat. 585.)

#### REFERENCES IN TEXT

The Federal Power Act, referred to in subsec. (c), is act June 10, 1920, ch. 285, 41 Stat. 1063, as amended, which is classified generally to chapter 12 (§ 791a et seq.) of Title 16, Conservation. For complete classification of this Act to the Code, see section 791a of Title 16 and Tables.

The Natural Gas Act, referred to in subsecs. (c) and (d), is act June 21, 1938, ch. 556, 52 Stat. 821, as amended, which is classified generally to chapter 15B (§ 717 et seq.) of Title 15, Commerce and Trade. For complete classification of this Act to the Code, see section 717w of Title 15 and Tables.

### § 7174. Referral of other rulemaking proceedings to Commission

#### (a) Notification of Commission of proposed action; public comment

Except as provided in section 7173 of this title, whenever the Secretary proposes to prescribe rules, regulations, and statements of policy of general applicability in the exercise of any function which is transferred to the Secretary under section 7151 of this title or section 60501 of title 49, he shall notify the Commission of the proposed action. If the Commission, in its discretion, determines within such period as the Secretary may prescribe, that the proposed action may significantly affect any function within the jurisdiction of the Commission pursuant to section 7172(a)(1) and (c)(1) of this title and section 60502 of title 49, the Secretary shall immediately refer the matter to the Commission, which shall provide an opportunity for public comment.

#### (b) Recommendations of Commission; publication

Following such opportunity for public comment the Commission, after consultation with the Secretary, shall either—

(1) concur in adoption of the rule or statement as proposed by the Secretary;

(2) concur in adoption of the rule or statement only with such changes as it may recommend; or

(3) recommend that the rule or statement not be adopted.

Council on Environmental Quality § 1501.6

(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or

(ii) The nature of the proposed action is one without precedent.

§ 1501.5 Lead agencies.

(a) A lead agency shall supervise the preparation of an environmental impact statement if more than one Federal agency either:

(1) Proposes or is involved in the same action; or

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) Federal, State, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement (§ 1506.2).

(c) If an action falls within the provisions of paragraph (a) of this section the potential lead agencies shall determine by letter or memorandum which agency shall be the lead agency and which shall be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement.

(2) Project approval/disapproval authority.

(3) Expertise concerning the action's environmental effects.

(4) Duration of agency's involvement.

(5) Sequence of agency's involvement.

(d) Any Federal agency, or any State or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the potential lead agencies that a lead agency be designated.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted within 45 days in a lead agency

designation, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency.

A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:

(1) A precise description of the nature and extent of the proposed action.

(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) A response may be filed by any potential lead agency concerned within 20 days after a request is filed with the Council. The Council shall determine as soon as possible but not later than 20 days after receiving the request and all responses to it which Federal agency shall be the lead agency and which other Federal agencies shall be cooperating agencies.

[43 FR 55992, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

§ 1501.6 Cooperating agencies.

The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any other Federal agency which has jurisdiction by law shall be a cooperating agency. In addition any other Federal agency which has special expertise with respect to any environmental issue, which should be addressed in the statement may be a cooperating agency upon request of the lead agency. An agency may request the lead agency to designate it a cooperating agency.

(a) The lead agency shall:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest possible time.

(2) Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent possible consistent with its responsibility as lead agency.

(3) Meet with a cooperating agency at the latter's request.

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest possible time.

1089

(2) Participate in the scoping process (described below in § 1501.7).

(3) Assume on request of the lead agency responsibility for developing information and preparing environmental analyses including portions of the environmental impact statement concerning which the cooperating agency has special expertise.

(4) Make available staff support at the lead agency's request to enhance the latter's interdisciplinary capability.

(5) Normally use its own funds. The lead agency shall, to the extent available funds permit, fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

(c) A cooperating agency may in response to a lead agency's request for assistance in preparing the environmental impact statement (described in paragraph (b)(3), (4), or (5) of this section) reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement. A copy of this reply shall be submitted to the Council.

### § 1501.7 Scoping.

There shall be an early and open process for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action. This process shall be termed scoping. As soon as practicable after its decision to prepare an environmental impact statement and before the scoping process the lead agency shall publish a notice of intent (§ 1508.22) in the FEDERAL REGISTER except as provided in § 1507.3(e).

(a) As part of the scoping process the lead agency shall:

(1) Invite the participation of affected Federal, State, and local agencies, any affected Indian tribe, the proponent of the action, and other interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under § 1507.3(c). An agency may give notice in accordance with § 1506.6.

(2) Determine the scope (§ 1508.25) and the significant issues to be analyzed in depth in the environmental impact statement.

(3) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (§ 1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

(4) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(5) Indicate any public environmental assessments and other environmental impact statements which are being or will be prepared that are related to but are not part of the scope of the impact statement under consideration.

(6) Identify other environmental review and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently with, and integrated with, the environmental impact statement as provided in § 1502.25.

(7) Indicate the relationship between the timing of the preparation of environmental analyses and the agency's tentative planning and decisionmaking schedule.

(b) As part of the scoping process the lead agency may:

(1) Set page limits on environmental documents (§ 1502.7).

(2) Set time limits (§ 1501.8).

(3) Adopt procedures under § 1507.3 to combine its environmental assessment process with its scoping process.

(4) Hold an early scoping meeting or meetings which may be integrated with any other early planning meeting the agency has. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(c) An agency shall revise the determinations made under paragraphs (a) and (b) of this section if substantial changes are made later in the proposed

Act are infused into the ongoing programs and actions of the Federal Government. It shall provide full and fair discussion of significant environmental impacts and shall inform decision-makers and the public of the reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is more than a disclosure document. It shall be used by Federal officials in conjunction with other relevant material to plan actions and make decisions.

## § 1502.2 Implementation.

To achieve the purposes set forth in § 1502.1 agencies shall prepare environmental impact statements in the following manner:

(a) Environmental impact statements shall be analytic rather than encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be kept concise and shall be no longer than absolutely necessary to comply with NEPA and with these regulations. Length should vary first with potential environmental problems and then with project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of the Act and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decisionmaker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§ 1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

## § 1502.3 Statutory requirements for statements.

As required by sec. 102(2)(C) of NEPA environmental impact statements (§ 1508.11) are to be included in every recommendation or report.

On proposals (§ 1508.23).

For legislation and (§ 1508.17).

Other major Federal actions (§ 1508.18).

Significantly (§ 1508.27).

Affecting (§§ 1508.3, 1508.8).

The quality of the human environment (§ 1508.14).

## § 1502.4 Major Federal actions requiring the preparation of environmental impact statements.

(a) Agencies shall make sure the proposal which is the subject of an environmental impact statement is properly defined. Agencies shall use the criteria for scope (§ 1508.25) to determine which proposal(s) shall be the subject of a particular statement. Proposals or parts of proposals which are related to each other closely enough to be, in effect, a single course of action shall be evaluated in a single impact statement.

(b) Environmental impact statements may be prepared, and are sometimes required, for broad Federal actions such as the adoption of new agency programs or regulations (§ 1508.18). Agencies shall prepare statements on broad actions so that they are relevant to policy and are timed to coincide with meaningful points in agency planning and decisionmaking.

(c) When preparing statements on broad actions (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2) Generically, including actions which have relevant similarities, such

as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(3) By stage of technological development including federal or federally assisted research, development or demonstration programs for new technologies which, if applied, could significantly affect the quality of the human environment. Statements shall be prepared on such programs and shall be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(d) Agencies shall as appropriate employ scoping (§ 1501.7), tiering (§ 1502.20), and other methods listed in §§ 1500.4 and 1500.5 to relate broad and narrow actions and to avoid duplication and delay.

### § 1502.5  Timing.

An agency shall commence preparation of an environmental impact statement as close as possible to the time the agency is developing or is presented with a proposal (§ 1508.23) so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decisions already made (§§ 1500.2(c), 1501.2, and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary.

(b) For applications to the agency appropriate environmental assessments or statements shall be commenced no later than immediately after the application is received. Federal agencies are encouraged to begin preparation of such assessments or statements earlier, preferably jointly with applicable State or local agencies.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the

public hearing related to the impact study. In appropriate circumstances the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.

### § 1502.6  Interdisciplinary preparation.

Environmental impact statements shall be prepared using an inter-disciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of the Act). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§ 1501.7).

### § 1502.7  Page limits.

The text of final environmental impact statements (e.g., paragraphs (d) through (g) of § 1502.10) shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages.

### § 1502.8  Writing.

Environmental impact statements shall be written in plain language and may use appropriate graphics so that decisionmakers and the public can readily understand them. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which will be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

### § 1502.9  Draft, final, and supplemental statements.

Except for proposals for legislation as provided in § 1506.8 environmental impact statements shall be prepared in two stages and may be supplemented.

(a) Draft environmental impact statements shall be prepared in accordance with the scope decided upon in the scoping process. The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements

1093

**Council on Environmental Quality** §1502.16

among alternatives). The summary will normally not exceed 15 pages.

### §1502.13  Purpose and need.

The statement shall briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action.

### §1502.14  Alternatives including the proposed action.

This section is the heart of the environmental impact statement. Based on the information and analysis presented in the sections on the Affected Environment (§1502.15) and the Environmental Consequences (§1502.16), it should present the environmental impacts of the proposal and the alternatives in comparative form, thus sharply defining the issues and providing a clear basis for choice among options by the decisionmaker and the public. In this section agencies shall:

(a) Rigorously explore and objectively evaluate all reasonable alternatives, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Devote substantial treatment to each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include reasonable alternatives not within the jurisdiction of the lead agency.

(d) Include the alternative of no action.

(e) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(f) Include appropriate mitigation measures not already included in the proposed action or alternatives.

### §1502.15  Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The descriptions shall be no longer than is necessary to understand the effects of the alternatives. Data

and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

### §1502.16  Environmental consequences.

This section forms the scientific and analytic basis for the comparisons under §1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) as is necessary to support the comparisons. The discussion will include the environmental impacts of the alternatives including the proposed action, any adverse environmental effects which cannot be avoided should the proposal be implemented, the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented. This section should not duplicate discussions in §1502.14. It shall include discussions of:

(a) Direct effects and their significance (§1508.8).

(b) Indirect effects and their significance (§1508.8).

(c) Possible conflicts between the proposed action and the objectives of Federal, regional, State, and local (and in the case of a reservation, Indian tribe) land use plans, policies and controls for the area concerned. (See §1506.2(d).)

(d) The environmental effects of alternatives including the proposed action. The comparisons under §1502.14 will be based on this discussion.

(e) Energy requirements and conservation potential of various alternatives and mitigation measures.

(f) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

1095

(g) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(h) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(f)).

[43 FR 55994, Nov. 29, 1978; 44 FR 873, Jan. 3, 1979]

### § 1502.17  List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§ 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis, including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

### § 1502.18  Appendix.

If an agency prepares an appendix to an environmental impact statement the appendix shall:

(a) Consist of material prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1502.21)).

(b) Normally consist of material which substantiates any analysis fundamental to the impact statement.

(c) Normally be analytic and relevant to the decision to be made.

(d) Be circulated with the environmental impact statement or be readily available on request.

### § 1502.19  Circulation of the environmental impact statement.

Agencies shall circulate the entire draft and final environmental impact statements except for certain appendices as provided in § 1502.18(d) and unchanged statements as provided in § 1503.4(c). However, if the statement is unusually long, the agency may circulate the summary instead, except that the entire statement shall be furnished to:

(a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

If the agency circulates the summary and thereafter receives a timely request for the entire statement and for additional time to comment, the time for that requestor only shall be extended by at least 15 days beyond the minimum period.

### § 1502.20  Tiering.

Agencies are encouraged to tier their environmental impact statements to eliminate repetitive discussions of the same issues and to focus on the actual issues ripe for decision at each level of environmental review (§ 1508.28). Whenever a broad environmental impact statement has been prepared (such as a program or policy statement) and a subsequent statement or environmental assessment is then prepared on an action included within the entire program or policy (such as a site specific action) the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions. (Section 1508.28).

### § 1502.21  Incorporation by reference.

Agencies shall incorporate material into an environmental impact statement by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the statement and its content briefly described. No material

**Council on Environmental Quality**

§ 1502.24

may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

### § 1502.22    Incomplete or unavailable information.

When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall always make clear that such information is lacking.

(a) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not exorbitant, the agency shall include the information in the environmental impact statement.

(b) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable; (2) a statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment; (3) a summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment, and (4) the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community. For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

(c) The amended regulation will be applicable to all environmental impact statements for which a Notice of Intent (40 CFR 1508.22) is published in the FEDERAL REGISTER on or after May 27, 1986. For environmental impact statements in progress, agencies may choose to comply with the requirements of either the original or amended regulation.

[51 FR 15625, Apr. 25, 1986]

### § 1502.23    Cost-benefit analysis.

If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with section 102(2)(B) of the Act the statement shall, when a cost-benefit analysis is prepared, discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations. In any event, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision.

### § 1502.24    Methodology and scientific accuracy.

Agencies shall insure the professional integrity, including scientific integrity, of the discussions and analyses in environmental impact statements. They shall identify any methodologies used and shall make explicit reference by footnote to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

1097

## § 1502.25 Environmental review and consultation requirements.

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrently with and integrated with environmental impact analyses and related surveys and studies required by the Fish and Wildlife Coordination Act (16 U.S.C. 661 *et seq.*), the National Historic Preservation Act of 1966 (16 U.S.C. 470 *et seq.*), the Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*), and other environmental review laws and executive orders.

(b) The draft environmental impact statement shall list all Federal permits, licenses, and other entitlements which must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other entitlement is necessary, the draft environmental impact statement shall so indicate.

# PART 1503—COMMENTING

Sec.
1503.1   Inviting comments.
1503.2   Duty to comment.
1503.3   Specificity of comments.
1503.4   Response to comments.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

SOURCE: 43 FR 55997, Nov. 29, 1978, unless otherwise noted.

## § 1503.1   Inviting comments.

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

(1) Obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved or which is authorized to develop and enforce environmental standards.

(2) Request the comments of:

(i) Appropriate State and local agencies which are authorized to develop and enforce environmental standards;

(ii) Indian tribes, when the effects may be on a reservation; and

(iii) Any agency which has requested that it receive statements on actions of the kind proposed.

Office of Management and Budget Circular A–95 (Revised), through its system of clearinghouses, provides a means of securing the views of State and local environmental agencies. The clearinghouses may be used, by mutual agreement of the lead agency and the clearinghouse, for securing State and local reviews of the draft environmental impact statements.

(3) Request comments from the applicant, if any.

(4) Request comments from the public, affirmatively soliciting comments from those persons or organizations who may be interested or affected.

(b) An agency may request comments on a final environmental impact statement before the decision is finally made. In any case other agencies or persons may make comments before the final decision unless a different time is provided under § 1506.10.

## § 1503.2   Duty to comment.

Federal agencies with jurisdiction by law or special expertise with respect to any environmental impact involved and agencies which are authorized to develop and enforce environmental standards shall comment on statements within their jurisdiction, expertise, or authority. Agencies shall comment within the time period specified for comment in § 1506.10. A Federal agency may reply that it has no comment. If a cooperating agency is satisfied that its views are adequately reflected in the environmental impact statement, it should reply that it has no comment.

## § 1503.3   Specificity of comments.

(a) Comments on an environmental impact statement or on a proposed action shall be as specific as possible and may address either the adequacy of the statement or the merits of the alternatives discussed or both.

(b) When a commenting agency criticizes a lead agency's predictive methodology, the commenting agency should describe the alternative methodology which it prefers and why.

(c) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental reviews or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant site-specific effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or entitlements.

(d) When a cooperating agency with jurisdiction by law objects to or expresses reservations about the proposal on grounds of environmental impacts, the agency expressing the objection or reservation shall specify the mitigation measures it considers necessary to allow the agency to grant or approve applicable permit, license, or related requirements or concurrences.

### § 1503.4  Response to comments.

(a) An agency preparing a final environmental impact statement shall assess and consider comments both individually and collectively, and shall respond by one or more of the means listed below, stating its response in the final statement. Possible responses are to:

(1) Modify alternatives including the proposed action.

(2) Develop and evaluate alternatives not previously given serious consideration by the agency.

(3) Supplement, improve, or modify its analyses.

(4) Make factual corrections.

(5) Explain why the comments do not warrant further agency response, citing the sources, authorities, or reasons which support the agency's position and, if appropriate, indicate those circumstances which would trigger agency reappraisal or further response.

(b) All substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous), should be attached to the final statement whether or not the comment is thought to merit individual discussion by the agency in the text of the statement.

(c) If changes in response to comments are minor and are confined to the responses described in paragraphs (a)(4) and (5) of this section, agencies may write them on errata sheets and attach them to the statement instead of rewriting the draft statement. In such cases only the comments, the responses, and the changes and not the final statement need be circulated (§ 1502.19). The entire document with a new cover sheet shall be filed as the final statement (§ 1506.9).

## PART 1504—PREDECISION REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

Sec.
1504.1  Purpose.
1504.2  Criteria for referral.
1504.3  Procedure for referrals and response.

AUTHORITY: NEPA, the Environmental Quality Improvement Act of 1970, as amended (42 U.S.C. 4371 *et seq.*), sec. 309 of the Clean Air Act, as amended (42 U.S.C. 7609), and E.O. 11514 (Mar. 5, 1970, as amended by E.O. 11991, May 24, 1977).

### § 1504.1  Purpose.

(a) This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements.

(b) Under section 309 of the Clean Air Act (42 U.S.C. 7609), the Administrator of the Environmental Protection Agency is directed to review and comment publicly on the environmental impacts of Federal activities, including actions for which environmental impact statements are prepared. If after this review the Administrator determines that the matter is "unsatisfactory from the standpoint of public health or welfare or environmental quality," section 309 directs that the matter be referred to the Council (hereafter "environmental referrals").

(c) Under section 102(2)(C) of the Act other Federal agencies may make similar reviews of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These reviews

agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental impact statement; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

(d) This section does not preclude development by applicants of plans or designs or performance of other work necessary to support an application for Federal, State or local permits or assistance. Nothing in this section shall preclude Rural Electrification Administration approval of minimal expenditures not affecting the environment (e.g. long leadtime equipment and purchase options) made by non-governmental entities seeking loan guarantees from the Administration.

## § 1506.2  Elimination of duplication with State and local procedures.

(a) Agencies authorized by law to cooperate with State agencies of statewide jurisdiction pursuant to section 102(2)(D) of the Act may do so.

(b) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) Agencies shall cooperate with State and local agencies to the fullest extent possible to reduce duplication between NEPA and comparable State and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for

cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent possible include joint environmental impact statements. In such cases one or more Federal agencies and one or more State or local agencies shall be joint lead agencies. Where State laws or local ordinances have environmental impact statement requirements in addition to but not in conflict with those in NEPA, Federal agencies shall cooperate in fulfilling these requirements as well as those of Federal laws so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State or local planning processes, statements shall discuss any inconsistency of a proposed action with any approved State or local plan and laws (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law.

## § 1506.3  Adoption.

(a) An agency may adopt a Federal draft or final environmental impact statement or portion thereof provided that the statement or portion thereof meets the standards for an adequate statement under these regulations.

(b) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the agency adopting another agency's statement is not required to recirculate it except as a final statement. Otherwise the adopting agency shall treat the statement as a draft and recirculate it (except as provided in paragraph (c) of this section).

(c) A cooperating agency may adopt without recirculating the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

(d) When an agency adopts a statement which is not final within the agency that prepared it, or when the action it assesses is the subject of a referral under part 1504, or when the statement's adequacy is the subject of

a judicial action which is not final, the agency shall so specify.

### § 1506.4  Combining documents.

Any environmental document in compliance with NEPA may be combined with any other agency document to reduce duplication and paperwork.

### § 1506.5  Agency responsibility.

(a) *Information.* If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental impact statement, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental impact statement, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers (§ 1502.17). It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.

(b) *Environmental assessments.* If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of paragraph (a) of this section, shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment.

(c) *Environmental impact statements.* Except as provided in §§ 1506.2 and 1506.3 any environmental impact statement prepared pursuant to the requirements of NEPA shall be prepared directly by or by a contractor selected by the lead agency or where appropriate under § 1501.6(b), a cooperating agency. It is the intent of these regulations that the contractor be chosen solely by the lead agency, or by the lead agency in cooperation with cooperating agencies, or where appropriate by a cooperating agency to avoid any conflict of interest. Contractors shall execute a disclosure statement prepared by the lead agency, or where appropriate the co-operating agency, specifying that they have no financial or other interest in the outcome of the project. If the document is prepared by contract, the responsible Federal official shall furnish guidance and participate in the preparation and shall independently evaluate the statement prior to its approval and take responsibility for its scope and contents. Nothing in this section is intended to prohibit any agency from requesting any person to submit information to it or to prohibit any person from submitting information to any agency.

### § 1506.6  Public involvement.

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures.

(b) Provide public notice of NEPA-related hearings, public meetings, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected.

(1) In all cases the agency shall mail notice to those who have requested it on an individual action.

(2) In the case of an action with effects of national concern notice shall include publication in the FEDERAL REGISTER and notice by mail to national organizations reasonably expected to be interested in the matter and may include listing in the *102 Monitor.* An agency engaged in rulemaking may provide notice by mail to national organizations who have requested that notice regularly be provided. Agencies shall maintain a list of such organizations.

(3) In the case of an action with effects primarily of local concern the notice may include:

(i) Notice to State and areawide clearinghouses pursuant to OMB Circular A–95 (Revised).

(ii) Notice to Indian tribes when effects may occur on reservations.

(iii) Following the affected State's public notice procedures for comparable actions.

(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations including small business associations.

1104

(a) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(b) With respect to all other agencies, any proposed major federal action to which section 102(2)(C) of NEPA applies.

### § 1508.20    Mitigation.

*Mitigation* includes:

(a) Avoiding the impact altogether by not taking a certain action or parts of an action.

(b) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(c) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(d) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(e) Compensating for the impact by replacing or providing substitute resources or environments.

### § 1508.21    NEPA process.

*NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

### § 1508.22    Notice of intent.

*Notice of intent* means a notice that an environmental impact statement will be prepared and considered. The notice shall briefly:

(a) Describe the proposed action and possible alternatives.

(b) Describe the agency's proposed scoping process including whether, when, and where any scoping meeting will be held.

(c) State the name and address of a person within the agency who can answer questions about the proposed action and the environmental impact statement.

### § 1508.23    Proposal.

*Proposal* exists at that stage in the development of an action when an agency subject to the Act has a goal and is actively preparing to make a decision on one or more alternative means of accomplishing that goal and the effects can be meaningfully evaluated. Preparation of an environmental impact statement on a proposal should be timed (§ 1502.5) so that the final statement may be completed in time for the statement to be included in any recommendation or report on the proposal. A proposal may exist in fact as well as by agency declaration that one exists.

### § 1508.24    Referring agency.

*Referring agency* means the federal agency which has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

### § 1508.25    Scope.

*Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§§ 1502.20 and 1508.28). To determine the scope of environmental impact statements, agencies shall consider 3 types of actions, 3 types of alternatives, and 3 types of impacts. They include:

(a) Actions (other than unconnected single actions) which may be:

(1) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions which may require environmental impact statements.

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously.

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Cumulative actions, which when viewed with other proposed actions have cumulatively significant impacts and should therefore be discussed in the same impact statement.

(3) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental

1112

**Council on Environmental Quality**                              **§ 1508.28**

consequencies together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the best way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(b) Alternatives, which include:

(1) No action alternative.

(2) Other reasonable courses of actions.

(3) Mitigation measures (not in the proposed action).

(c) Impacts, which may be: (1) Direct; (2) indirect; (3) cumulative.

### § 1508.26  Special expertise.

*Special expertise* means statutory responsibility, agency mission, or related program experience.

### § 1508.27  Significantly.

*Significantly* as used in NEPA requires considerations of both context and intensity:

(a) *Context.* This means that the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the world as a whole. Both short- and long-term effects are relevant.

(b) *Intensity.* This refers to the severity of impact. Responsible officials must bear in mind that more than one agency may make decisions about partial aspects of a major action. The following should be considered in evaluating intensity:

(1) Impacts that may be both beneficial and adverse. A significant effect may exist even if the Federal agency believes that on balance the effect will be beneficial.

(2) The degree to which the proposed action affects public health or safety.

(3) Unique characteristics of the geographic area such as proximity to historic or cultural resources, park lands, prime farmlands, wetlands, wild and scenic rivers, or ecologically critical areas.

(4) The degree to which the effects on the quality of the human environment are likely to be highly controversial.

(5) The degree to which the possible effects on the human environment are highly uncertain or involve unique or unknown risks.

(6) The degree to which the action may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration.

(7) Whether the action is related to other actions with individually insignificant but cumulatively significant impacts. Significance exists if it is reasonable to anticipate a cumulatively significant impact on the environment. Significance cannot be avoided by terming an action temporary or by breaking it down into small component parts.

(8) The degree to which the action may adversely affect districts, sites, highways, structures, or objects listed in or eligible for listing in the National Register of Historic Places or may cause loss or destruction of significant scientific, cultural, or historical resources.

(9) The degree to which the action may adversely affect an endangered or threatened species or its habitat that has been determined to be critical under the Endangered Species Act of 1973.

(10) Whether the action threatens a violation of Federal, State, or local law or requirements imposed for the protection of the environment.

[43 FR 56003, Nov. 29, 1978; 44 FR 874, Jan. 3, 1979]

### § 1508.28  Tiering.

*Tiering* refers to the coverage of general matters in broader environmental impact statements (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basinwide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement

1113

DEPARTMENT OF ENERGY
REDELEGATION ORDER NO. 00-006.02
TO THE ASSISTANT SECRETARY FOR FOSSIL ENERGY

1.    DELEGATION.  Pursuant to section 202(b) of the Department of Energy Organization Act (Public Law 95-91, 42 U.S.C. 7132(b)) and the Secretary of Energy's Delegation Order to the Under Secretary for Science (and Energy), I delegate to the Assistant Secretary for Fossil Energy, authority to take the following actions:

   1.1    In reference to the Great Plains project under section 19(g)(2) of the Federal Non nuclear Energy Research and Development Act of 1974 (Public Law 93-577, as amended by Public Law 95-238)(the Federal Nonnuclear Act) and as provided by section 646(a) of the Department of Energy Organization Act (Public Law 95-91):

      A.    Carry out all functions of the Contracting Officer as that term is defined in the Asset Purchase Agreement dated as of October 7, 1988, and amended as of October 31, 1988, February 16, 1994, and December 21, 1998, between the United States of America, Dakota Gasification Company, Dakota Coal Company and Basin Electric Power Cooperative, which was executed as part of the conveyance of the Department of Energy's (Department or DOE) interests in the Great Plains Coal Gasification Project in Beulah, North Dakota, to Dakota Gasification Company and Dakota Coal Company.

      B.    Undertake all actions that are necessary and proper, on behalf of the United States of America, acting by and through the Secretary of Energy, to administer all agreements and contracts entered into by the Department of Energy in connection with the conveyance of the Department's interests in the Great Plains project.

            In exercising the authority delegated by this order, the delegate may act without regard to the provisions of the Federal Property and Administrative Services Act of 1949, as amended, except section 207 of that Act (40 U. S. C. 5488), or any other law, as specifically provided for by section 19(g)(2) of the Federal Nonnuclear Act, supra.

   1.2    In reference to the Naval Petroleum Reserves:

      A.    Perform all functions vested in me by Subtitle B of the National Defense Authorization Act for Fiscal Year 1996 (Public Law 104-106) relating to the sale of Naval Petroleum Reserve Numbered 1, including the finalization of equity.

B.    Perform the functions specified in 10 U.S.C. 7427 and 7428, and vested in me by the President of the United States in Executive Order No. 12929, in order to meet the goals and objectives of the Naval Petroleum Reserves.

C.    Perform all functions vested in me by law (10 U.S.C. 7420-7439, including 10 U.S.C. 7420 note) relating to the administration of and jurisdiction over the Naval Petroleum Reserves, except for condemnation proceedings and the execution of procurement contracts with non-Governmental entities affecting such Reserves.

D.    Perform all duties and responsibilities required by the Unit Plan Contract between the United States of America and Chevron U.S.A., Inc., numbered Nod-4219, dated June 19, 1944, as amended; the Amendatory and Supplemental Agreement, between the same parties, numbered Nod-8477, dated December 22, 1948, as amended; and the Agreement to Terminate the Unit Plan Contract, between the same parties, dated February 5, 1998.

E.    Perform all duties and responsibilities relative to the disposition of the United States share of petroleum produced from the Naval Petroleum Reserves to or for the Department of Defense and the Strategic Petroleum Reserve pursuant to 10 U.S.C. 7430(k) and (l).

F.    Perform all functions vested in me by the provisions of Section 3404(b) of the Strom Thurmond National Defense Authorization Act for Fiscal Year 1999 (Public Law 105-261; 10 USC 7420 note) for the disposition by sale, of Naval Petroleum Reserve Numbered 3.

1.3    In reference to the regulation of imports and exports of natural gas:

A.    Perform the functions vested in me by sections 301(b) and 402(f) of the Department of Energy Organization Act to regulate natural gas under section 3 of the Natural Gas Act, as amended by section 201 of the Energy Policy Act of 1992 (15 U.S.C. 717b):

1.    Consistent with the authority delegated by this Order, the Assistant Secretary may attach such terms and conditions to import and export authorizations as the Assistant Secretary shall determine to be appropriate.

2.    The authority delegated by this Order does not include the authority to approve the construction and operation of particular facilities, the site at which such facilities shall be located, and, with respect to natural gas that involves the construction of new

3

> domestic facilities, the place of entry for imports or exit for exports, except the Assistant Secretary is authorized to disapprove the construction and operation of particular facilities, the site at which such facilities shall be located, and, with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports.

B.    Establish and review priorities for the curtailment of natural gas pursuant to the Natural Gas Act (15 U.S.C. 717), sections 401, 402, and 403 of the Natural Gas Policy Act of 1978 (Public Law 95-621, 15 U.S.C. 3391-3393); and consult with the Deputy Secretary concerning energy emergency-related curtailment policy guidance, as necessary or appropriate.

1.4    Exercise the authority of the Secretary of Energy under Subtitle J of the Energy Policy Act of 2005 (Public Law 109-58, 42 U.S.C. 16371 to 16378). The authority specifically provided to the National Energy Technology Laboratory pursuant to Subtitle J of the Energy Policy Act of 2005 shall not be affected by this Order.

1.5    Participate in any proceeding before the Federal Energy Regulatory Commission, pursuant to the provisions of section 405 of the Department of Energy Organization Act (42 U.S.C. 7175), or in any proceeding before any Federal or State agency or commission whenever such participation is related to the exercise of authority delegated to the Assistant Secretary.

1.6    Formulate and establish enforcement policy, initiate and conduct investigations, conduct conferences, administrative hearings and public hearings, prepare required reports, issue orders, and take such other action as may be necessary or appropriate to perform any of the above functions.

1.7    Under section 988 of the Energy Policy Act of 2005:

A.    Approve requests for reduction or elimination of the cost sharing requirement for research and development activity of an applied nature in accordance with 988(b)(3);

B.    Approve requests for reduction of the cost sharing requirement for the non-federal share of demonstration and commercial application activities in accordance with 988(c)(2); and

C.    Exclude research and development of a basic or fundamental nature from the cost sharing requirements, as described in 988(b)(2).

These authorities may be exercised only after providing notification to the Office of the Secretary. Furthermore, the approval Authorities

4

delegated in subparagraphs A and B can be exercised only in coordination with the Secretarial Policy Statement entitled, "Application and Reduction or Elimination of Cost Share Requirements Under Section 988 of EPACT 2005, Pub.L. 109-58." The authorities of this paragraph may be redelegated to the Chief Operating Office and no further.

1.8    Establish, alter, consolidate or discontinue such organizational units or components within assigned organizational elements as deemed to be necessary or appropriate

    A.    In exercising this authority, or as redelegated pursuant thereto, delegates will be limited by approved budgets, staffing level allocations, and Senior Executive Service and other executive resource position allocations. Organizational changes shall not be announced or implemented until appropriate union coordination and other pre-release clearances have been obtained.

    B.    This authority does not include approval of additional, deletion, or transfer of mission and functions of or between Departmental Headquarters or Field Elements, which authority is reserved to the Secretary.

    C.    Heads of Departmental Headquarters Elements may delegate the authority to alter or consolidate organizational elements further, in whole or in part, consistent with the terms of the Department of Energy Organization Act, to an official or officials one level below the Head of the Departmental Headquarters or Field Element.

    D.    The authority to establish or discontinue organizational elements at the first or second level below the Head of the Departmental Headquarters or Field Element may not be redelegated.

    E.    Acting Heads of Departmental Headquarters or Field Elements may not redelegate these authorities and may only establish, alter, consolidate or discontinue organizational units at the third level and below. During the tenure of an acting Head of a Departmental Headquarters or Field Element, organizational units below the Head of the Departmental Headquarters and Field Elements may not exercise redelegations granting the authority to alter or consolidate units.

1.9    Pursuant to 18 U.S.C. 208(b)(3), after consultation with the Department's Designated Agency Ethics Official, issue conflict-of-interest waivers for special Government employees serving on a Federal Advisory Committee that is administratively supported by the Office of Fossil Energy.

1.10    For all programs funded by Fossil Energy appropriations, exercise the authority of the Secretary of Energy under the Energy and Water Development and Related Agencies Appropriations Act, 2010 (Pub. L. 111-85), Title III, Department of Energy, Energy Programs, Fossil Energy Research and Development, to vest fee title or other property interests acquired in any entity, including the United States.

1.11    Exercise the authority of the Secretary of Energy under Title IV, Subtitle A, Section 402(f) of the Energy Policy Act of 2005 (Public Law 109-58, 42 U.S.C. 15962) with respect to scheduled completion of selected Clean Coal Power Initiative projects.

2.    RESCISSION.  Redelegation Order 00-002.04F is hereby rescinded.

3.    LIMITATION.

3.1    In exercising the authority delegated in this Order, a delegate shall be governed by the rules and regulations of the Department of Energy and the policies and procedures prescribed by the Secretary or delegate(s).

3.2    Nothing in this Order precludes the Secretary or the Under Secretary for Science (and Energy) from exercising any of the authority delegated by this Order.

3.3    Nothing in this Order shall be construed to supersede or otherwise interfere with the authorities provided to the Administrator for Nuclear Security by law or by delegation.  Furthermore, nothing herein constitutes authority to exercise authority, direction, or control of an employee of the National Nuclear Security Administration or its contractors.

3.4    Any amendments to this Order shall be made in consultation with the Department of Energy General Counsel.

4.    AUTHORITY TO REDELEGATE.

4.1    Except as prohibited by law, regulation, or this Order, the Assistant Secretary for Fossil Energy may delegate this authority further, in whole or in part.

4.2    Copies of redelegations and any subsequent redelegations shall be provided to the Office of Management, which manages the Secretarial Delegations of Authority system.

6

## 5.    DURATION AND EFFECTIVE DATE.

5.1    All actions pursuant to any authority delegated prior to this Order or pursuant to any authority delegated by this Order taken prior to and in effect on the date of this Order are ratified and remain in force as if taken under this Order, unless or until rescinded, amended or superseded.

NOV 17 2014

5.2    This Order is effective _____.

Ernest J. Moniz
Secretary of Energy

DEPARTMENT OF ENERGY
DELEGATION ORDER NO. 00-004.00A
TO THE FEDERAL ENERGY REGULATORY COMMISSION

1.   <u>DELEGATION</u>.  Under the authority vested in me as Secretary of Energy ("Secretary") and pursuant to sections 642 and 402(e) of the Department of Energy Organization Act (Public Law 95-91, 42 U.S.C. 7252) (the "DOE Act"), I delegate to the Federal Energy Regulatory Commission ("Commission") authority to take the following actions:

1.1   On a nonexclusive basis to the Chairman,

A.   Administer and manage the Commission's personnel (including members of the Senior Executive Service) as is not otherwise granted the Chairman by statute. This authority delegated to the Chairman for administration and management of the Commission's personnel shall include, but not be limited to:
1.   selection and appointment of personnel;
2.   performance appraisals and performance appraisal systems;
3.   compensation, promotions, awards, and bonuses;
4.   reorganizations, transfers of functions, reductions in force, and the standards governing such reductions;
5.   removals and disciplinary actions; and
6.   training, travel, and transportation.

B.   Enter into, modify, administer, terminate, close-out, and take such other action as may be necessary and appropriate with respect to any procurement contract, interagency agreement, financial assistance agreement, financial incentive agreement, sales contract, or other similar action binding the Department of Energy to the obligation and expenditure of public funds or the sale of products and services that are related to the mission of the Commission.  Such action shall include the rendering of approvals, determinations, and decisions, except those required by law or regulation to be made by other authority.

C.   Serve as the Head of the Procuring Activity (HPA) for the Federal Energy Regulatory Commission.

D.   Appoint Contracting Officers for the Commission.

E.   Acquire, manage, and dispose of personal property held by the Commission for official use by its employees or contractors.

F.   Approve acquisitions of automatic data processing and telecommunications equipment and services.

Addendum 33

1.2     Carry out Part I of the Federal Power Act (Public Law 280, 66th Cong., 2d Sess., as amended), to the extent that such authority is not transferred to, and vested in, the Commission by section 402(a)(1)(A) of the DOE Act, <u>provided</u> that this paragraph delegates (A) section 4 of the Federal Power Act to the extent the Commission determines the exercise of such authority is necessary for it to exercise any function transferred to, and vested in, the Commission by this delegation, and (B) section 24 of the Federal Power Act (relating to the granting of entry, location, or other disposition of lands of the United States reserved or classified as power sites).

1.3     Carry out such functions as are necessary to implement and enforce the Secretary's policy requiring holders of Presidential permits authorizing the construction, operation, maintenance, or connection of facilities for the transmission of electric energy between the United States and foreign countries to provide non-discriminatory open access transmission services.  In exercising this authority the Commission is specifically authorized to utilize the authority of the Secretary under Executive Order No. 10485, dated September 3, 1953, as amended by Executive Order No. 12038, dated February 3, 1978, and section 202(e) of the Federal Power Act (FPA) (16 U.S.C. 824a(e)) and such other sections of the FPA vested in the Secretary as may be relevant, to regulate access to, and the rates, terms, and conditions for, transmission services over permitted international electric transmission facilities to the extent the Commission finds it necessary and appropriate to the public interest.  This authority is delegated to the Commission for the sole purpose of authorizing the Commission to take actions necessary to implement and enforce non-discriminatory open access transmission service over the United States portion of those international electric transmission lines required by the Secretary to provide such service.  Nothing in this delegation shall allow the Commission to revoke, amend, or otherwise modify Presidential permits or electricity export authorizations issued by the Secretary.

1.4     Implement section 202(a) of the Federal Power Act (relating to dividing the country into regional districts).

1.5     Implement section 203 of the Federal Power Act (relating to the disposition, merger or consolidation of facilities and the acquisition of securities);

1.6     Implement section 204 of the Federal Power Act (relating to the issuance of securities and the assumption of liabilities);

1.7     Implement section 206(b) of the Federal Power Act (relating to the investigation and determination of the cost of production or transmission of electric energy), as the Commission determines appropriate to perform its functions;

1.8     Implement section 207 of the Federal Power Act (relating to adequate and sufficient interstate service);

3

1.9     Implement section 209 of the Federal Power Act (relating to use of boards composed
of State representatives and cooperation with State commissions);

1.10    Implement section 304 of the Federal Power Act (relating to annual and periodic or
special reports), as the Commission determines appropriate to perform its functions;

1.11    Implement section 305 of the Federal Power Act (relating to officers or directors
benefiting from the sale of issued securities and to interlocking directorates);

1.12    Implement section 311 of the Federal Power Act (relating to investigations regarding the
generation, transmission, distribution, and sale of electric energy), as the Commission
determines appropriate to perform its functions;

1.13    Implement sections 1(b) and 1(c) of the Natural Gas Act (ch. 556, 52 Stat. 821
(1938)(15 U.S.C. 717)) (relating to certain exemptions from the provisions of the
Natural Gas Act);

1.14    Implement section 3 of the Natural Gas Act with respect to the decision on cases
assigned to the Commission by rule;

1.15    Implement section 5(b) of the Natural Gas Act (relating to the investigation and
determination of the cost of production or transportation of natural gas), as the
Commission determines appropriate to perform its functions;

1.16    Implement section 10 of the Natural Gas Act (relating to annual and periodic or special
reports), as the Commission determines appropriate to perform its functions;

1.17    Implement section 12 of the Natural Gas Act (relating to officers or directors benefiting
from the sale of issued securities);

1.18    Implement section 19 of the Natural Gas Act (relating to rehearings on orders);

1.19    Implement the Interstate Commerce Act (49 U.S.C. 1, et seq.) and other statutes which
formerly vested authority in the Interstate Commerce Commission or the chairman and
members thereof, as such statutes relate to the transportation of oil by pipeline, to the
extent that such statutes are not transferred to, and vested in, the Commission by
section 402(b) of the DOE Act, provided that this paragraph does not include any of
the authority under section 11 of the Clayton Act (15 U.S.C. 21);

1.20    Issue orders, and take such other action as may be necessary and appropriate, to direct
the Energy Information Administration to gather energy information pursuant to the
Federal Energy Administration Act of 1974 or the Energy Supply and Environmental
Coordination Act of 1974 to the extent necessary or appropriate to the exercise of
regulatory functions of the Commission;

1.21   In reference to regulating the imports and exports of natural gas under the National Gas Act (ch. 556, 52 Stat. 821 (1938)(15 U.S.C. 717)), Executive Order No. 10485, as amended by Executive Order No. 12038, and section 301(b), 402(e) and (f) under the Department of Energy Organization Act (Public law 95-91, 91 Stat. 565 (42 U.S.C. 7101 et seq.),

     A.   Approve or disapprove the construction and operation of particular facilities, the site at which such facilities shall be located, and with respect to natural gas that involves the construction of new domestic facilities, the place of entry for imports or exit for exports, except when the Assistant Secretary for Fossil Energy exercises the disapproval authority pursuant to the Delegation of Authority to the Assistant Secretary for Fossil Energy.

     B.   Carry out all functions under sections 4, 5, and 7 of the Natural Gas Act.

     C.   Issue orders, authorizations, and certificates which the Commission determines to be necessary or appropriate to implement the determinations made by the Assistant Secretary for Fossil Energy under the Delegation of Authority to the Assistant Secretary and by the Commission under this subparagraph.  The Commission shall not issue any order, authorization, or certificate unless such order, authorization, or certificate adopts such terms and conditions as are attached by the Assistant Secretary for Fossil Energy pursuant to the Delegation of Authority to the Assistant Secretary of Fossil Energy.

1.22   Implement section 216(h) of the Federal Power Act, and specifically paragraphs (2), (3), (4)(A)-(B), and (5), to coordinate federal authorizations and related environmental reviews, and to prepare a single environmental review document, for electric transmission facilities in national interest electric transmission corridors designated pursuant to section 216(a) of the Federal Power Act, for which an applicant has submitted an application to the Commission for issuance of a permit for construction or modification under section 216(b) of the Federal Power Act.

2.   RESCISSION. Delegation Order 00-004.00 is hereby rescinded.

3.   LIMITATIONS.

3.1   In exercising the authority delegated in paragraphs 1.1B through 1.1F in this Order, or redelegated pursuant thereto, the delegate(s) shall be governed by the rules and regulations of the Department of Energy and the policies and procedures prescribed by the Secretary or delegate(s).

3.2   Nothing in this Order precludes the Secretary from exercising any of the authority delegated by this Order.

5

3.3    Except as provided in paragraph 1.14, this Order does not include the authority to carry out the functions delegated herein to the extent such functions are vested in the Secretary pursuant to his authority to regulate the exports or imports of natural gas or electricity, under section 402(f) of the DOE Act; provided that the Secretary may from time to time delegate to the Commission such other authority under section 3 of the Natural Gas Act as may be determined appropriate.

3.4    The Commission shall consult with the Administrator of the Energy Information Administration (AEIA@) with respect to the exercise of functions under paragraphs 1.7, 1.10, 1.12, 1.15, 1.16, and 1.20, as EIA considers appropriate.

3.5    Any amendments to this Order shall be in consultation with the Department of Energy General Counsel.

4.    <u>AUTHORITY TO REDELEGATE</u>.

4.1    Except as expressly prohibited by law, regulation, or this Order, the Commission may delegate, this authority further, in whole or in part.

4.2    Copies of redelegations and any subsequent redelegations shall be provided to the Office of Information Resources, which manages the Secretarial Delegations of Authority system.

5.    <u>DURATION AND EFFECTIVE DATE</u>.

5.1    All actions pursuant to any authority delegated prior to this Order or pursuant to any authority delegated by this Order taken prior to and in effect on the date of this Order are ratified, and remain in force as if taken under this Order, unless or until rescinded, amended or superseded.

5.2    This Order is effective May 16, 2006.

Samuel W. Bodman
Secretary of Energy